# IN THE SUPREME COURT OF IOWA

No. 16–1441

Filed April 28, 2017

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Appellee,

vs.

**THEODORE FREDRICK SPORER,**

Appellant.

Appeal from the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission recommended six-month suspension of attorney's license. **LICENSE SUSPENDED.**

Theodore F. Sporer, Des Moines, pro se.

Tara van Brederode and Elizabeth E. Quinlan, for appellee.

**APPEL, Justice.**

In this disciplinary case, attorney Theodore Sporer appeals the findings and recommendations of the Iowa Supreme Court Grievance Commission recommending his law license be suspended for a period of six months. The alleged ethical violations occurred in the aftermath of a divorce decree. In a contempt proceeding arising from the divorce decree, the district court found Sporer falsely testified that he rejected the terms of a settlement letter sent by the opposing lawyer by immediately writing handwritten notes on the letter and sending it back to the opposing lawyer on the same day. The district court also found Sporer falsely and frivolously asserted that the secretary's signature on the bottom of a settlement letter bound the client to the terms of a settlement agreement.

The Iowa Supreme Court Attorney Disciplinary Board filed a complaint alleging various violations of our ethical rules. After a hearing, the commission concluded that Sporer violated Iowa Rule of Professional Conduct 32:3.1 ("A lawyer shall not . . . assert or controvert an issue . . . unless there is a basis in law and fact for doing so that is not frivolous . . . ."), rule 32:3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal . . . ."), rule 32:8.4(c) ("It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]"), and rule 32:8.4(d) ("It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice[.]"). The commission did not find a violation of rule 32:3.4(a) ("A lawyer shall not . . . unlawfully alter, destroy, or conceal a document . . . .") as alleged by the Board.

Based upon our review, we affirm the findings of the grievance commission. We also affirm most of the grievance commission's conclusions. We suspend Sporer's license to practice law for six months.

**I. Factual Background and Proceedings.**

**A. Introduction.** Sporer has been licensed as an Iowa attorney for thirty-one years. During this time, he has maintained a law office in Polk County, Iowa. Sporer's primary practice areas are civil litigation and domestic relations.

Sporer has a disciplinary history. On August 24, 2011, Sporer received a public reprimand from the Board for violating rule 32:1.4(a)(3) and (4) by failing to inform a client of her trial date and respond to her reasonable inquiries, rule 32:1.3 by failing to diligently file documents in a litigated matter, rule 32:8.4(d) by causing delays in litigation, and rule 32:8.4(c) by engaging in deceit or misrepresentation for advising a client that an order for sanctions was the result of a clerical error.

**B. Overview of Factual Record Before the Commission.**

1. *Propstein divorce proceedings.* In 2012, Sporer represented Gary Propstein in a dissolution action against Linda Propstein. Lawyer Timothy Duffy represented Linda in the proceedings. The record before the commission establishes that on March 30, 2012, the district court entered its "Findings of Fact, Conclusions of Law, and Decree" in the Propstein divorce proceeding. At the time of the entry of the decree, both Gary and Linda were fifty-three-years old. Their marriage had lasted twenty-one years.

In dividing the marital property, the district court noted that dissipation of assets is a proper consideration. The district court found that Gary had unreasonably dissipated marital assets in contemplation of the dissolution. The court concluded Gary had unreasonably spent

$139,000 from a 401(k) account and $30,000 from the parties' home equity line of credit. The district court stated it would adjust the distribution of the remaining marital property as if these expenditures had not occurred.

The district court ordered Gary to pay Linda approximately $23,835 for Linda's share in the marital home. The court also ordered that Linda receive substantial retirement assets through a qualified domestic relations order (QDRO) with a value in excess of $100,000. In addition, the court ordered that Gary's interest in a defined benefits plan be distributed between the parties according to the formula established in *In re Marriage of Benson*, 545 N.W.2d 252, 255–57 (Iowa 1996). The district court awarded Linda rehabilitative alimony in the amount of $200 per month for three years.

Sporer filed a motion to amend, requesting that either Gary be given at least eighteen months to pay Linda her equity share in the home or, alternatively, be allowed to transfer his interest in an IRA valued at $23,313 to Linda.

While the motion to amend was pending, the lawyers engaged in settlement negotiations. Consistent with the motion to amend, Sporer proposed that Gary provide Linda with additional retirement funds to offset Linda's equity share in the marital home. The parties, however, were not able to finalize the agreement, the district court overruled the motion to amend, and Sporer filed a notice of appeal on Gary's behalf on July 30, 2012.

Sporer did not file a supersedeas bond or seek a stay of the district court order. As a result, the filing of the notice of appeal did not stay enforcement of the district court decree. Gary, however, did not pay Linda the $23,835 for her equitable share in the marital residence within

thirty days as required by the district court. On August 30, 2012, Duffy filed a contempt application on behalf of Linda. The district court set a hearing for October 10.

Cumulatively, the district court's order, Gary's motion to amend, his settlement posture, his failure to post a supersedeas bond, and his failure to timely pay Linda the $23,835 as required by the divorce decree, suggest that Gary was strapped for cash in the aftermath of the divorce proceeding.

2. *September settlement communications.* Against the backdrop of Linda's contempt application and the October 10 hearing date, the parties renewed settlement negotiations. On September 21, Sporer sent Duffy a letter proposing settlement. In the September 21 settlement letter, Sporer proposed that Gary pay Linda $27,000 by cashier's check within twenty-one days, that Linda execute a quit claim deed on the house, that Gary dismiss the pending appeal, that the parties exchange releases of all claims, and that each party remain responsible for their own attorney's fees. The September 21 settlement letter did not expressly discuss the distribution of Gary's retirement assets and benefits or the execution of an appropriate QDRO.

On September 24, Duffy responded with a settlement letter of his own. In his September 24 settlement letter, Duffy responded that the offer from Sporer was acceptable, but with certain changes. Duffy then specifically indicated that he needed information necessary to prepare a QDRO in the matter and asked for any instructions or model language the plan administrator might have to assist in the preparation of the QDRO. From Duffy's September 24 settlement letter, it was apparent that Duffy did not regard Linda's entitlement to her share of Gary's

retirement assets and benefits as within the scope of the proposed mutual releases.

According to Sporer, he received Duffy's September 24 settlement letter on September 27. Sporer claimed that on September 27, he took a red Sharpie, drew large Xs through the last paragraph related to the QDRO, and wrote the following undated note in his hand: "Duffy— Pardon the informality. No—complete release all claims! No $ w/o release! TFS." Sporer further claimed that he sent Duffy a copy of the marked-up September 24 settlement letter on September 27 via facsimile, hand delivery, and regular mail.

Duffy, however, denied receiving the marked-up version of his September 24 settlement letter from Sporer. Sporer's billing records for September 27 do not contain any entry for either reviewing Duffy's letter or communicating with Duffy on that date. Although Sporer's office had procedures in place to retain confirmation of faxed messages and to document hand deliveries that were sent out of the office, Sporer did not produce any such documents related to the September 24 settlement document with Sporer's handwritten notes.

Further, on September 27, Sporer received an email from Gary, asking, "Any confirmation yet? From [D]uffy or [L]inda?" On September 28, Sporer relied, "Yes, we are settled. I am working on papers to finalize early next week. Keep you posted." Sporer made no mention of Duffy's September 24 settlement letter in his September 28 email to Gary.

3. *Secretary signs bottom of attorney's letter.* On October 9, 2012, Duffy learned that a $27,000 check was available for Linda at Sporer's office. The record does not reveal the details of how the availability of the check was communicated to Duffy. In any event, Duffy dispatched his

secretary, Teresa Young, to pick up the check at Sporer's office. When she arrived at Sporer's office, Young was provided with the check, a letter dated October 9 which repeated verbatim the terms contained in Sporer's September 21 settlement letter, and a six-page, single-space document entitled "Settlement and Release of Claims." According to Young, when she turned to leave Sporer's office with the documents in hand, she was told by Sporer's staff that she needed to sign something.

Young signed the presented document without reading it. The document she signed was the October 9 letter that summarized the terms of Sporer's original September 21 settlement letter to Duffy. At the bottom of the October 9 letter, however, an additional sentence was added in a font different from the body of the letter: "Payment and terms accepted by Linda Propstein, by and through her attorney Timothy Duffy." A line was provided for a signature. The October 9 letter did not mention Duffy's September 24 settlement letter discussing the need for information to prepare a QDRO or the annotated version of the September 24 letter that Sporer claimed he sent to Duffy on September 27.

The next day, October 10, Linda and Duffy reviewed the terms of the "Settlement and Release of Claims." Duffy was concerned that the language of the document could be construed to release Linda's award of retirement assets in the divorce decree. As a result, Duffy modified the document by inserting the handwritten phrase "except pending QDRO concerning pet. retirement accounts per decree" in three places on the "Settlement and Release of Claims." Linda initialed each handwritten change, and she signed the document before a notary. Also on October 10, Linda cashed Gary's check for $27,000.

On October 11, 2012, Duffy dismissed the contempt complaint with prejudice. On October 22, Sporer dismissed his appeal in the divorce proceeding. On October 23, Sporer testified he received a letter from Duffy dated October 18, along with the modified "Settlement and Release of Claims" with Duffy's handwritten alterations.

Remarkably, Sporer did not respond to the modified "Settlement and Release of Claims." He did not advise Duffy that the changes were unacceptable. On the other hand, Sporer did not have his client sign the document.

On October 29, Duffy sent Sporer a quitclaim deed for the marital residence. In the letter, Duffy stated, "I am still needing the information on your client's 401k so I can prepare the Qualified Domestic Relations Order." Sporer did not respond. On November 8 and November 30, Duffy again wrote to Sporer regarding QDRO information. Again, Sporer did not respond.

On December 10, 2012, however, Duffy's assistant received a phone call from Sarah Gelbowitz, Sporer's paralegal. Duffy's assistant wrote a message about the call, which stated that Gelbowitz advised her that "Ted [Sporer] is meeting w/Gary on Friday and will get QDRO info to us by Next Tues. or Weds." The QDRO information, however, was not provided to Duffy.

4. *Court filings and unsuccessful mediation.* On January 17, 2013, Duffy filed what he styled as an "Application for Hearing on Implementation of Terms of Decree of Dissolution of Marriage," seeking to obtain the assistance of the district court in implementing the terms of the divorce decree in light of Sporer's failure to respond to his repeated inquiries regarding the QDRO. Sporer still did not respond, either to Duffy or to the district court. On March 6, Duffy filed his second

contempt application against Gary. When the parties appeared before the district court on March 20, the court ordered Sporer to file a response to Duffy's filings within twenty days, ordered the parties to mediate the contempt action, and ordered the parties to exchange exhibits at least five days prior to the hearing. The district court set the pending matters for hearing on April 23.

On April 17, the parties participated in mediation with mediator Joseph Seidlin. During the mediation, Sporer took the position that under the circumstances, there was a binding settlement agreement between the parties which released any claims that Linda might have under the divorce decree with respect to Gary's retirement assets.

Also on April 17, Sporer filed a resistance to Duffy's "Application for Hearing on Implementation of Terms of Decree of Dissolution of Marriage." In that resistance, Sporer asserted that the parties "reached a full, final and written settlement of all issues described in the Application." Sporer also pled that Linda had "accepted the benefits of the settlement and has thereafter attempted to enforce the original terms of the [divorce] Decree." Sporer further pled that Linda's claims were "barred by the doctrines of estoppel, waiver, [and] accord and satisfaction." As a result, Sporer on behalf of Gary asked that the application be denied with prejudice.

Sporer additionally filed a resistance in the contempt action on April 17. In the resistance, Sporer denied that Gary had engaged in contemptuous behavior. He further asserted two affirmatives defenses—the first alleging that the application fails "to state a prima facie claim of contempt." For his second affirmative defense, Sporer asserted that Linda's claim, "if any, is barred by the doctrine of accord and satisfaction.

5. *Testimony offered in contempt proceedings before the district court.* The contempt matter was continued from April 23 to allow Sporer to retain an attorney. The matter came to hearing on June 5, 2013, and July 19, 2013, before Judge Douglas Staskal. The record of the district court proceedings was made part of the record before the commission.

At the contempt hearing, Gary, Duffy, and Sporer testified as witnesses. On June 5, Gary testified that he was told the matter was settled and to bring to Sporer's office a check. Gary further testified that after the check was received by Linda, "we waited ten days . . . to see if there were any aftershocks from the settlement agreement." Gary also told the district court he had spent all the money in the retirement funds in any event.

The next witness to testify in the contempt proceeding on June 5 was Duffy, who was examined by other counsel. Duffy testified that Young had authority to pick up the check but not to settle the case. He testified that the fighting issue on October 10 was payment of the $23,835 in cash ordered by the district court. Duffy further testified that he never intended to settle or dismiss Linda's claim to the retirement assets under the district court's order.

The last witness in the contempt hearing on June 5 was Sporer. Sporer testified regarding exhibit 4, the September 24 settlement letter with handwritten annotations by Sporer. Sporer testified that he wrote the notations "literally the moment [he] saw the September 24 letter." He testified that he used handwritten notions on the September 24 settlement letter to communicate with Duffy because "[he] was in a hurry." With respect to whether the September 24 settlement letter with Sporer's notations was sent to Duffy, Sporer testified, "I know it was mailed. I believe it was faxed. And I also believe that it was hand

delivered." Sporer further testified that Linda cashed the check on October 10 and that "[he thought] there was a complete meeting of the minds."

On redirect examination, Sporer was asked when the parties achieved an agreement. Sporer responded, "When the signature of Teresa Young appeared that says, Payment and terms accepted by Linda Propstein by and through her attorney, Timothy Duffy." On recross-examination, Sporer dug in further. He testified, "[I]t is unfathomable to me that Ms. Young would be anything other than a full agent, as I would expect my staff—anything that your staff signs on your behalf, you're stuck with, unless it's a legal pleading." According to Sporer, Linda sought to avoid the risks of an appeal and was willing to accept $27,000 in exchange for a full release of claims, including the retirement benefits.

Sporer presented a brief closing argument to the district court. In closing, Sporer asserted, "[W]e had a complete settlement. They intended exactly what happened in this case. The evidence overwhelmingly shows that." Addressing the issue specifically of whether Gary was in contempt, Sporer asserted, "[Gary] didn't do anything intentionally. We have been acting under the belief that we have a settlement. That it was clear. And this [—] this later attempt is just—was just a trick."

After oral argument, the district court continued the hearing. The district court ordered Gary to produce all records showing funds taken from Gary's retirement accounts. The court also ordered Gary not to dispose of property in his possession other than for food, clothing, and living expenses until the district court issued a ruling in the matter.

The district court found there was no agreement for Linda to release her property under this dissolution decree. The court found Duffy's secretary did not have authority to bind Linda to such an

agreement, nor was there, in fact, such an agreement. The district court characterized Sporer's argument that Duffy manipulated the situation in order to get the appeal dismissed and led Sporer to believe he was giving up his client's rights was "ludicrous" and unbelievable.

The district court reconvened the hearing on the contempt action on July 19. The court began the hearing by summarizing the prior proceedings and then asking questions of counsel. The court asked Duffy whether he had ever seen exhibit 4, the version of his September 24 settlement letter with handwritten notes written by Sporer. Duffy responded, "[Neither] I nor anybody on my staff has ever seen that document." The district court then turned to Sporer and asked him whether it was his testimony that exhibit 4 had been mailed, faxed, and hand delivered to Duffy's office. Sporer replied, "That is correct," but qualified his response by stating, "I am not entirely certain that it was hand-delivered. I had given instructions to that effect but I am not sure that they were executed."

At this point, Gary took the stand and provided further testimony. Based on the documents submitted by the parties and to the district court after the June 5 hearing, Gary admitted that, in fact, he had not drained all the funds out of his retirement accounts. Gary testified that his inaccurate prior statement was "made in frustration." Gary further testified he drew down funds from his retirement accounts in March even after the contempt action had been filed. He testified that when he did so, he thought the matter had been settled.

The district court asked Gary when he thought the matter had been settled. Gary testified he thought the matter had been settled in September. He testified Sporer told him that Linda had "accepted the offer of the $27,000 to cash now to settle everything."

After Gary's testimony, Duffy again took the stand. Duffy testified that at the mediation, Duffy presented his September 24 settlement letter as showing that Linda wanted the retirement assets ordered by the court. Duffy further testified that Sporer did not present the version of the September 24 settlement letter with his handwritten notes at the mediation. According to Duffy, the modified September 24 settlement letter was never in his office, never presented to the mediator, and never presented to Duffy. Instead, Duffy testified that the mediator presented Duffy with the original document with Young's signature on it, a clear reference to the October 9 letter signed by Young when she picked up Gary's check from Sporer's office.

Duffy further testified that the records produced by Gary showed that Gary withdrew money from a Wells Fargo retirement account on September 22 to provide the $27,000 to Linda. While Gary testified that he withdrew funds to pay Linda prior to September 30, he denied that he withdrew the funds specifically on September 22.

At the conclusion of Duffy's testimony, the district court asked Sporer whether he showed the September 24 settlement letter with his handwritten notes to the mediator, Seidlin. Sporer testified that he had the document with him at the time of the mediation, but could not recall whether he showed the document to Seidlin. When asked by the court whether anyone else had ever seen the September 24 settlement letter with the handwritten notes, Sporer stated attorney Andrea Flanagan was in the room when he wrote it and his paralegal Gelbowitz would have been the person responsible for making copies. Neither Flanagan nor Gelbowitz, however, was called as a witness by Sporer in the contempt proceedings.

The district court asked Sporer, "If [the September 24 settlement letter with your notes] existed . . ., why wouldn't you have shown it to Mr. Seidlin, to the mediator?" Sporer responded,

> Mr. Duffy and his client were claiming that they were not responsible for a signed agreement that we had with his office's signature on it.
>
> If they were willing to argue that that was somehow not our agreement that was signed, . . . I didn't see anything to be gained by future negotiations in this mediation because anything that we say, there is just a story invented to explain it, explain any facts that we have used.

Sporer briefly closed with additional argument. Sporer told the district court, "I believe we reached a full and final settlement agreement and once the respondent received the benefit, 100 percent of the benefit of that settlement agreement, they withdraw."

The district court declared the matter submitted. The court then observed, "This case is about as troubling as any case the court has ever had and not just because of what the petitioner did." The court advised the parties it would provide a written ruling. The district court further stated,

> I don't believe by any stretch of anyone's imagination that the respondent released an over $100,000 award in a decree for retirement assets in the context of settling a contempt action in which she was owed money for another reason. To me, it's ridiculous, ridiculous and every time I even think about it[,] it troubles me.

The district court advised Gary, for planning purposes, to begin figuring out how he could comply with the decree of the district court.

6. *District court's contempt ruling.* The district court entered its written ruling on August 19. The court found that Gary's claims were "meritless and contrived." The court found that Sporer presented the defense to the contempt "without even a subjective belief in its validity."

The court further found that Sporer "lied under oath and fabricated evidence."

On the question of whether Linda surrendered her rights to retirement assets and benefits as part of a settlement, the district court concluded that she had not. The court emphasized that in Duffy's September 24 settlement letter, Duffy stated the need to obtain information for preparation of a QRDO, an observation which, according to the district court, "would have been completely out of place and nonsensical" if Linda were relinquishing her retirement award as a term of the settlement.

The district court then turned to the version of Duffy's September 24 letter containing Sporer's handwritten notes. As the court observed, the significance of the handwritten notation is that if it were received by Duffy, it would suggest that Gary was insisting on the release of Linda's claim for retirement funds and that Duffy was aware of this position.

But the district court concluded that the September 24 settlement letter with Sporer's handwritten note was "a fraud." The court cited the tone, substance, and circumstances of the note. The court emphasized that it would be absurd for Linda to give up her retirement benefit of more than $100,000, plus an unknown value of a share of a defined benefit pension, in exchange for $3000. Further, the court noted that it would be extremely unlikely that Linda would surrender the retirement award in settlement of the contempt action *against Gary*.

Further, the district court reasoned that there was no plausible motivation for Linda to accept "such a ridiculous agreement." According to the court, there was no prospect of the district court's award of retirement benefits to be eliminated on appeal. The only argument

presented by Gary was a fault-based argument unlikely to result in any adjustment of the amount of the retirement account award.

The district court also concluded that Sporer had received Duffy's edited version of Sporer's "Settlement and Release of Claims" that excluded Linda's share of Gary's retirement assets prior to Sporer's dismissal of Gary's appeal. The court reasoned that a local letter dated October 18 and placed in the mail on that date would likely be delivered prior to October 22. Even if the release had not yet been received, the district court concluded, no attorney would dismiss an appeal, an irrevocable act, unless the proper documentation was in hand. In addition, the district court pointed out that Sporer was silent after receiving Duffy's modified version of the "Settlement and Release of Claims" for many months after its receipt.

The district court further emphasized that Sporer's staff in December 2012 communicated with Duffy's office indicating that they were trying to assemble needed retirement information for the QRDO. The court observed that this communication demonstrated that as of December, Sporer did not believe Linda had released her share of the retirement assets in a settlement agreement.

After entry of the district court's ruling, a sentencing hearing was held on September 6. Sporer declined to provide a further statement. Gary, however, did make a statement to the district court. Gary's statement covered many topics, but included a statement about the mediation. According to Gary,

> When we mediated the contempt, Mr. Sporer had all the documents we used at the contempt hearing with him. The only document I thought was relevant was the signed agreement. The mediation was brief. Linda admitted that Mr. Duffy's office signed the settlement agreement. I thought that was enough to prove we had settled.

The district court sentenced Gary to six months in jail. Mittimus was withheld pending Gary's payment of the funds and execution of the document related to the QDRO and compliance with the district court's order.

7. *Proceedings before the commission.* The Board filed its complaint against Sporer on October 7, 2015. Sporer filed an answer on November 13, admitting many of the alleged facts but denying violation of any ethical rules. Two aspects of Sporer's answer are noteworthy.

First, in response to the Board's allegation that on December 10, 2012, Duffy's secretary took a message from Gelbowitz in Sporer's office stating that "Ted [Sporer] is meeting w/Gary on Friday and will get QDRO info to us by Next Tues. or Weds.," Sporer denied the allegation as he did not know who took the message but admitted there was a brief telephone call in the matter. Sporer did not deny the content of the December 10 message as alleged by the Board.

Second, in response to the Board's allegation that Sporer for the first time raised the defenses of accord and satisfaction, estoppel, and waiver in court papers filed on April 17, 2013, Sporer denied the allegation. He alleged that the defenses of laches and estoppel were specifically discussed at the mediation. He further claimed he asserted accord and satisfaction or waiver in the mediation.

The commission heard the matter on February 22, February 23, and February 26, 2016. The testimony before the commission was more extensive than that before the district court in the contempt matter. Witnesses included Duffy, Judge Joseph Seidlin, Teresa Young, Andrea Flanagan, Sarah Gelbowitz, Gary Propstein, Cherie Bradshaw, and Judge Douglas Staskal.

Much of the testimony before the commission tracked that presented to Judge Staskal in the contempt proceeding and will not be repeated here. Some additional information, however, was elicited from witnesses before the commission.

With respects to the merits of the underlying divorce case, Duffy stated, "It was as solid a case as I'd ever seen." He testified that he had never received or saw the September 24 settlement letter with the handwritten notes by Sporer prior to the contempt proceeding. Duffy testified that prior to the scheduled April 23 contempt hearing, Duffy received a copy of the document from Sporer identified as an "October 23, 2012 note, Sporer to Duffy." According to Duffy, that was the first time he had ever seen the document.

Duffy provided additional testimony regarding the circumstances surrounding events on October 9 and October 10, 2012. Duffy testified that his secretary, Teresa Young, did not have authority to bind Duffy or his clients. Duffy did not recall whether he reviewed the settlement documents before his client cashed the check, although he remembered reading the settlement agreement and release with his client on October 10. Duffy told the commission, "When I amended it, it reflected what our intent was." When asked why Duffy did not contact Sporer before cashing the check, Duffy responded, "I made a counteroffer [on September 24]. I ended up with the check, I ended up with the release. I gave the check to my client, we went through the release, and we preserved her QDRO rights." When pressed on how Sporer would know that Duffy viewed the terms of the settlement as different from Sporer's September 21 settlement letter, Duffy responded,

> I'm the one who made the last offer. You [Sporer] never counteroffered anything. . . . You [Sporer] told me the check's ready. I'm to assume that it had settled. This

document is boilerplate, maybe dressed up a little by you, and I was concerned that it would give up more than my client intended.

. . . .

. . . I gave you [Sporer] credit for not trying to trick my client.

The mediator in this matter, now Judge Joseph Seidlin, briefly testified before the commission. He testified that he did not recall ever seeing the version of the September 24 settlement letter with Sporer's handwriting. He testified that Sporer, in effect, took the position in the mediation that "I've got a signed settlement agreement, they cashed the check, we dismissed our appeal and now they want to get out of it."

Duffy's secretary, Young, testified before the commission. She recounted retrieving the settlement documents and the check from Sporer's office on October 9. Young testified,

I think I was given the check, and I turned to leave and the gal behind the counter said, "Wait, you need to sign this." I didn't read it; I just signed it assuming that it was a receipt of some kind that I had picked up the check.

The next witness before the commission after Young was Sporer. Sporer testified that he had a heated conversation with Duffy on September 27. Sporer asserted he told Duffy he could be sued for possessing stolen bank records of his client, that Duffy was exposed to an abuse of process claim for obtaining an ex parte order, and the possibility of bringing something under RICO for "combining all of the illegal things they did." Sporer told the commission that on September 27, he took a red Sharpie and made the handwritten annotations on the letter. He testified that two people, lawyer Flanagan and paralegal Gelbowitz, were in his office at the time or part of the time when these events occurred.

When asked whether Sporer took the position at the contempt hearing that the October 9 letter signed by Duffy's secretary was a binding contract, Sporer stated, "[T]hat, accompanied by two other things." Sporer elaborated on his hedge—"I have a signed agreement, a cashed check, a very long period upon holding the repudiation of that signed agreement." Sporer told the commission that he did not believe Young's signature alone was binding, although "in theory, that argument could be made."

Sporer testified he received the amended "Settlement and Release of Claims" after he dismissed his appeal on October 22. He claimed the October 18 date on the letter accompanying the document was a fraud. Sporer claimed Duffy saw his dismissal of the appeal before he sent to him the modified version of the "Settlement and Release of Claims."

Lawyer Andrea Flanagan, the managing partner of the Sporer law firm, testified before the commission. Flanagan recalled overhearing Sporer in a heated phone conversation with an unidentified person. When she left her office to see what was going on, Flanagan stated she saw Sporer instructing Gelbowitz in some way. He had a piece of paper in his hand with Duffy's letterhead and was yelling "that's not what we agreed to." Flanagan testified,

> I believe a check had been issued, someone had picked it up, and then when Mr. Duffy's client was supposed to sign the release that the parties had agreed on, instead of signing it as presented he made changes to it. And that frustrated Ted [Sporer] because the agreement was that his client was on a full release.

According to Flanagan, Sporer made it clear that "in our office never again would a check be sent out to the other side in a settlement situation without a release." Flanagan placed these events in "the fall of 2012, maybe October" but was not sure.

Flanagan testified she did not remember seeing Sporer mark the document with a red Sharpie at the time of the phone call. She testified, however, that she later saw the document with his writing on it.

Flanagan was asked how the Sporer office documented fax transmissions. Flanagan testified that the fax machine prints a receipt and the receipt is stapled to the back of the document and placed in the file. Flanagan indicated it would be abnormal not to have such a receipt on a faxed document, but such failures were the kind of problems the firm had when Gelbowitz was an employee. Gelbowitz was eventually terminated from her position at the law firm for failure to follow "important policies."

Flanagan also indicated it would be unusual to have someone hand deliver a document by a process server without some kind of documentation regarding delivery. Flanagan indicated that one of the reasons the office no longer used Cherie Bradshaw, a friend of Sporer's, as a process server was because of her consistent failure to document delivery of papers.

Sarah Gelbowitz, who was a paralegal in the Sporer office at the time of the events surrounding this matter, testified before the commission. Gelbowitz testified that she remembered an occasion when Sporer raised his voice on the phone, heard the phone clang down "pretty loudly," and saw Sporer writing on the bottom of a letter with a red Sharpie, saying, "This should get his attention." Gelbowitz recalled that Flanagan stepped into the office to see what was going on. Gelbowitz did not recall the date of these events, but placed them sometime between July and December, 2012.

Gelbowitz further testified that Sporer directed that the document be "taken to him [Duffy] and delivered immediately" and sent it to Duffy

through fax and mail as well. Gelbowitz testified that she hand delivered the document, faxed it, and mailed it to Duffy. Gelbowitz also testified that normally she would keep fax confirmation pages, but there were times "when they didn't print out" or that sometimes "the fax pages did not get kept with the letters once they were sent."

Gelbowitz also testified regarding the December 10, 2012 communication with Duffy's office. Gelbowitz testified that she and Sporer had numerous conversations about the Propstein file and that Sporer was "trying to get things settled." Gelbowitz stated that her phone conversation with Duffy's office on December 10 lasted "[p]robably less than a minute." Gelbowitz recalled that when she told Sporer about the communication with Duffy's office, Sporer was not too happy that she took it upon herself to call Duffy's office. Gelbowitz remembered that Sporer told her "everything was on hold at the moment" and "[n]othing was going out or being done" until Sporer and Duffy "worked some things out." Gelbowitz stated Sporer told her that Duffy was trying "to weasel out of a settlement agreement."

While Gelbowitz testified that she hand delivered the September 24 settlement letter with Sporer's handwritten comments to Duffy, Cherie Bradshaw testified that she hand delivered the document as well. Bradshaw, a friend of Sporer, was in the Sporer law office at the time of the outburst about which Flanagan and Gelbowitz testified. According to Bradshaw, Sporer asked her to deliver the document to the Duffy law office. She testified that she folded the paper up and delivered it a day or two later. Bradshaw testified she did not get a receipt for delivery because she was not instructed to do so.

The last two witnesses before the commission were Gary Propstein and Judge Staskal. Propstein testified that he first learned of the

settlement in late September or early October, 2012. Judge Staskal generally described his ruling. He stated on cross-examination that the September 24 settlement letter with Sporer's notes may have first surfaced in April as part of the exchange of documents in the contempt proceeding and not in June, as he had previously thought. Judge Staskal testified that the fact the September 24 settlement letter with Sporer's annotations surfaced a few months earlier than he originally thought did not change his opinion on the matter.

### C. Commission's Findings of Fact and Violations.

1. *Findings of fact.* The commission found that Sporer did not send the September 24 settlement letter with his handwritten annotations to Duffy. In reaching its conclusion, the commission noted that Sporer's handwritten note was not dated and that Sporer's billing records for September 27 did not list any communications with Duffy. Further, the commission noted that Sporer could not produce any confirmation of fax or hand delivery on September 27, notwithstanding office procedures designed to retain such confirmation.

The commission further found that it was unusual to handwrite a response to a settlement letter. The commission stated Sporer's September 21 settlement letter noted that Sporer had a conflict with the October 9 date set for the contempt hearing and that the matter would need to be continued if the parties did not settle the matter. The commission reasoned that the September 21 suggestion that the matter might need to be continued suggested a lack of urgency in the settlement negotiations.

The commission found it unusual that a document such as the September 24 letter with Sporer's annotations on it would be served on the opposing party in three ways. The purported importance of ensuring

the document was received by Duffy through three methods of delivery was inconsistent with the fact that no documentation of any kind was kept showing delivery of the document by any means.

Although the commission recognized Sporer offered testimony of the managing attorney in his office, Flanagan, in support of his claim that he sent the annotated version of the September 24 settlement letter to Duffy on September 27, the commission found Flanagan's testimony did not support Sporer's assertions. The commission observed that although Flanagan testified she heard Sporer in a heated conversation with someone, she could not identify who that someone was. The commission further reasoned that Flanagan's focus on the incident was to make sure the office would never again send out a check without a signed release. The commission concluded this testimony did not support Sporer's claim that the document was sent to Duffy on September 27, which was before any settlement check was issued.

With respect to the testimony of Gelbowitz, the commission found inconsistencies in her testimony adversely affected her credibility and on balance her testimony did not support Sporer's claim that he prepared the handwritten note on September 27 and sent it to Duffy on that date. The commission noted the lack of fax confirmation. Further, the commission found Gelbowitz created a memorandum to memorialize the delivery of the document, but then deleted it from the system even though the Propstein matter was still an open file.

The commission further found that Linda would not have accepted $27,000 in return for a full release of her claim to future retirement benefits in excess of $100,000. The commission noted there was no objective reason to believe that on appeal Gary could completely reverse the trial court's award of retirement benefits. Further, the commission

found Gary had no defense to the contempt action, thus indicating that Gary rather than Linda should have been more motivated to effect a settlement.

The commission also concluded the September 24 settlement letter with Duffy's notes did not surface until April 23, 2013. Like Judge Staskal, the commission found Sporer's silence in response to Duffy's revised release and Duffy's November 8 and 30 letters was consistent with the real agreement of the parties, which did not include release of retirement claims.

The commission also made findings of fact regarding the Board's charges that Sporer advanced a frivolous claim and made false statements before a tribunal. The commission found that it was not objectively reasonable for Sporer to argue that the October 9, 2012 signature by Young gave rise to a binding settlement agreement. Further, the commission did not believe that Young in fact had such authority.

2. *Violations.* Rule 32:3.1 provides that a lawyer "shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that it is not frivolous." Iowa R. Prof'l Conduct 32:3.1. The commission concluded that Sporer violated rule 32:3.1. The commission found there was no reasonable basis for Sporer to assert Young had authority to enter a settlement agreement when she signed the October 9 letter. According to the commission, there was no evidence indicating Young had such agency. Young was simply a messenger. The commission found Sporer violated rule 32:3.1 by arguing otherwise.

Rule 32:3.3(a)(1) provides, in relevant part, "A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal. . . ."

*Id.* r. 32:3.3(a)(1). The commission concluded Sporer violated rule 32:3.3(a)(1) by falsely testifying in the contempt proceeding that he added his notes to Duffy's September 24 settlement letter on September 27. The commission found no evidence that the document was created on that date, and concluded that had the document existed then, it would have been used by Sporer in the contempt mediation.

The commission also found a violation of rule 32:3.3(a)(1) when Sporer testified in the contempt proceeding that he believed Young's signature on the October 9 letter legally bound Linda to release her retirement benefits. The commission reasoned that because Sporer had not been told Young had such authority, Sporer had no reason to believe her agency extended to approving a settlement.

Rule 32:3.4(a) provides, "A lawyer shall not . . . unlawfully . . . alter, destroy, or conceal a document or other material having potential evidentiary value." *Id.* r. 32:3.4(a). The commission concluded that Sporer did not violate this rule. The commission concluded that in order to violate the rule, a lawyer must affirmatively change the substance of an existing document. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Thompson*, 732 N.W.2d 865, 866 (Iowa 2007) (finding a violation where attorney forged signature on order for hearing); *Comm. on Prof'l Ethics & Conduct v. Hurd*, 325 N.W.2d 386, 388, 390 (Iowa 1982) (involving attorney altering a document by cutting three lines from a motion, then taping the motion together and filing). According to the commission, Sporer did not alter any document, but instead created a new document when he added the annotations to Duffy's September 24 settlement letter.

Rule 32:8.4(c) provides, "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or

misrepresentation[.]" Iowa R. Prof'l Conduct 32:8.4(c). The commission found Sporer falsely testified that he wrote the handwritten note on September 27 in violation of the rule. The commission further found Sporer violated the rule when he falsely stated he subjectively believed Young's signature on the October 9 document created a binding settlement agreement.

Finally, rule 32:8.4(d) provides, "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." *Id.* r. 32:8.4(d). The commission found that Sporer's misconduct violated the rule by causing the district court to hold numerous hearings, including the contempt hearings on June 5, July 19, and September 6, 2013, and thus unnecessarily expend considerable judicial resources.

**D. Commission's Recommended Sanction.** Before imposing sanctions, the commission considered aggravating and mitigating factors. The sole mitigating factor cited by the commission was Sporer's timely cooperation with the disciplinary proceedings.

With respect to aggravating factors, the commission noted Sporer committed multiple violations of ethical rules, had a prior public reprimand, was an experienced practitioner, and refused to admit wrongful conduct or show remorse. The commission recommended Sporer's license to practice law be suspended for six months as a result of the ethical violations.

**II. Standard of Review.**

The standard of review in lawyer discipline proceedings is de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 461 (Iowa 2014). "The Board must prove violations by a convincing preponderance of the evidence." *Iowa Supreme Ct. Att'y Disciplinary Bd.*

*v. Wright*, 857 N.W.2d 510, 514 (Iowa 2014). Although we are not bound by the commission's findings, we give them respectful consideration, especially with respect to witnesses' credibility. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Ginkel*, 809 N.W.2d 96, 101 (Iowa 2012); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGrath*, 713 N.W.2d 682, 695 (Iowa 2006).

**III. Discussion.**

**A. Violations Related to Assertion that Duffy's Secretary Had Authority to Bind the Client to Settlement Agreement.** The commission found Sporer violated four of our ethical rules by asserting in the contempt proceeding that Duffy's secretary had authority to bind Duffy's client to the terms of a settlement agreement favorable to Sporer's client. *See* Iowa R. Prof'l Conduct 32:3.1 (frivolous claims, defenses, or issues); *id.* r. 32:3.3(a)(1) (knowingly making false statement of fact or law to a tribunal); *id.* r. 32:8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation); *id.* r. 32:8.4(d) (conduct prejudicial to the administration of justice).

Sporer, however, asserts that he was not relying merely on the fact that Duffy's secretary signed the October 9 short-form settlement agreement. In his briefing before us, Sporer combines the signature of the October 9 letter with the subsequent cashing of the $27,000 settlement check by Linda after Duffy's secretary delivered the documents to her employer to bind Linda to Sporer's settlement terms.

Sporer also claims on appeal that he never argued that the mere fact of Young's signature bound Duffy and Linda to the October 9 settlement. He claims that he argued below that Young's signature was the first step in a chain of events that bound Linda to the terms of the

October 9 settlement letter and the enclosed settlement agreement and release.

According to Sporer, by cashing the $27,000 check, an accord and satisfaction occurred. Accord and satisfaction arises when "valid consideration is offered, intended and accepted in full satisfaction of a claim." *Kissner v. Brown*, 487 N.W.2d 97, 98 (Iowa Ct. App. 1992) (per curiam). By cashing the check, according to Sporer, an accord and satisfaction defense arose to any claims that Linda might bring against Gary, including contempt.

In a second variation of the argument, Sporer further suggests that Young's signature, even if affixed without authority, was ratified by Linda's accepting the consideration before repudiating Young's authority to bind Linda. An agent may exceed authority and bind the principal if the principal "appropriates the benefits of the acts of the agent. Ratification is, in fact, equivalent to previous authority." *James Horrabin & Co. v. McCallum*, 191 Iowa 441, 442, 182 N.W. 646, 646 (1921) (citation omitted). In order for ratification to occur, there must be the "intent of the principal to ratify the agent's act which can be either expressed or implied." *Joseph L. Wilmotte & Co. v. Rosenman Bros.*, 258 N.W.2d 317, 324 (Iowa 1977) (quoting *Abodeely v. Cavras*, 221 N.W.2d 494, 502 (Iowa 1974)).

In a third variation of the argument, Sporer argues that Duffy took no action to repudiate the terms of the October 10 settlement until October 18. If he objected, according to Sporer, Duffy had a duty to disclose to Sporer Duffy's lack of agreement in a timely fashion. Yet, Duffy did not get back to Sporer until he sent a letter with modifications to the proposed settlement agreement on October 18. In reliance upon Duffy's silence for more than a week, Sporer claimed he dismissed the

appeal on October 19, only to learn when the mail was received on October 23—according to Sporer—that Linda did not agree to Gary's October 10 terms. Sporer claims he dismissed his appeal of the underlying divorce action, however, in reliance on a lack of repudiation.

Neither the district court nor the commission addressed these alternative arguments now presented by Sporer in this appeal. This is, in part, because of the nature of Sporer's advocacy before the district court in the contempt action. Sporer pled that the parties "reached a full, final and written settlement of all issues described in the Application." This pleading seems impliedly to rely upon Young's signature, but is not inconsistent with a ratification defense. Sporer also pled that Linda "accepted the benefits of the settlement and has thereafter attempted to enforce the original terms of the Decree," a pleading that surely put the accord and satisfaction defense in play before the district court. Finally, Sporer further pled that Linda's claims were "barred by the doctrines of estoppel, waiver, accord and satisfaction." But Sporer did not file a brief before the district court elaborating upon his accord and satisfaction, ratification, and estoppel arguments.

In any event, Sporer's statement in his brief that he "never argued the mere fact of Young's signature bound Duffy and Linda to the Short Form Settlement Agreement" is simply inaccurate. At the contempt hearing, Sporer generally acted as a lawyer representing Gary, but also took the stand as a witness and was examined by another lawyer. As a witness under oath at the contempt hearing, Sporer testified, "I believe that when the signature was made on October 9 by a party's agent authorized—to the best of our knowledge authorized to make that signature, that constitutes a full and final agreement." And further,

Sporer argued, "[I]t is unfathomable to me that Ms. Young would be anything other than a full agent, as I would expect my staff—anything that your staff signs on your behalf, you're stuck with, unless it's a legal pleading."

It was this testimony—and not the other defenses raised in Sporer's legal filings on behalf of Gary—that drew the ire of Judge Staskal, who concluded, beyond a reasonable doubt, that Sporer

> lied under oath when he testified to a subjective belief that, by signing the bottom of his September 21 offer letter when she picked up the $27,000 check, Duffy's secretary had legally committed Linda to giving up the retirement award.

Putting aside the question of whether Sporer had other good-faith defenses available in the contempt action, the Board's charge and the commission's finding have a narrower dimension. The asserted violations are not based on the fact that Sporer defended Gary in the contempt action. Instead, the charge is based primarily on Sporer's remarkable testimony as a witness in the contempt hearing that he believed Young had authority to bind Linda and Duffy when she signed the bottom of the October 9 letter, and it was "unfathomable" that she did not have such authority.

Although the Board alleged and the commission found multiple violations of our ethical rules, we focus our attention primarily on the question of whether Sporer knowingly made a false statement of fact or law before a tribunal in violation of rule 32:3.3(a)(1) and whether Sporer violated rule 32:3.1 related to frivolous claims.

We begin by observing that Sporer's assertion that it was "unfathomable" to him that Young was anything other than a full agent is objectively absurd. Every lawyer knows that clerical staff provide essential support to a legal practice and make significant contributions

to the lawyers and clients for whom they perform administrative services. Yet no lawyer, let alone a highly experienced lawyer, reasonably believes that clerical staff performing routine tasks such as retrieval of documents have authority, actual or apparent, to bind clients of the firm. We are not surprised that neither Sporer nor we have found legal authority supporting the proposition that legal secretaries generally have authority to bind clients of the attorneys for whom they work. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barnhill*, 847 N.W.2d 466, 485 (Iowa 2014) (noting that when we determine whether there is a basis in law or fact that is not frivolous, we ask whether there was legal authority to support the attorney engaging in the conduct).

Of course, it is not a violation of rule 32:3.3(a)(1) to advance even an objectively absurd position. In order to violate this specific rule, the Board must prove that the lawyer "knowingly" made a false statement of fact or law to a tribunal. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 603 (Iowa 2011) (holding misrepresentation must be made knowingly, not negligently).

On this subjective issue, we give respectful consideration to the findings of Judge Staskal in the contempt hearing and the commission in this proceeding. The commission and Judge Staskal did not believe Sporer actually believed his extraordinary assertion that secretaries have authority to bind clients to settlement agreements. We too simply find it hard to accept the notion that an experienced lawyer would believe a secretary dispatched on a routine mission of picking up legal documents had the authority to bind a client to the terms of a settlement agreement, particularly one in which a party was required to surrender a substantial legal claim. We thus conclude that the Board proved by a convincing

preponderance of the evidence that Sporer knowingly made a false statement of fact or law to the tribunal in violation of rule 32:3.3(a)(1).

In the alternative, even if we found that Sporer's conduct was not "knowing," we would conclude that Sporer through his testimony asserted or controverted an issue without a basis in law or fact in violation of rule 32:3.1. To the extent, however, that Sporer claimed Young had authority to bind the client by signing the October 9 letter, we think he asserted an issue that had no basis in fact or law.

We note that the Board did not claim and the commission did not find that the defenses of accord and satisfaction, ratification, and estoppel were frivolous or that Sporer did not subjectively believe in these potential theories. Instead, the Board and the commission focused on the assertion that Sporer falsely claimed that by signing the October 9 letter, Young bound Linda to unfavorable settlement terms. To the extent Sporer made this specific argument—and he did make this specific argument before the district court in the contempt proceeding— we find Sporer has violated both rule 32:3.1 and rule 32:3.3(a)(1).

Finally, we consider whether Sporer engaged in conduct prejudicial to the administration of justice in violation of rule 32:8.4(d). Among other things, an attorney's conduct that results in additional or delayed court proceedings violates the rule. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 180 (Iowa 2013).

We do not find the Board has shown a violation by a convincing preponderance of the evidence of this rule in light of the posture of this case. As indicated above, the Board focuses primarily on Sporer's assertion regarding Young's authority to bind Linda. In its complaint, the Board does not assert that there were no potential defenses in the contempt action. In particular, although the Board addresses Sporer's

estoppel argument in part, the Board's briefing does not address the accord and satisfaction and ratification arguments, issues plainly raised by Sporer's resistance in the district court contempt proceedings. We thus are unable to conclude Sporer's conduct violated rule 32:8.4(d) because the Board has not shown that the hearings associated with the contempt matter would not have occurred but for the ethical violations or that they were materially delayed or extended by Sporer's unfounded testimony.

**B. Violations Related to Handwritten Version of the September 24 Settlement Letter.** The Board charged and the commission found violations of five of our ethical rules arising out of Sporer's use of the version of the September 24 settlement letter from Duffy that had his handwritten annotations. Iowa R. Prof'l Conduct 32:3.1 (asserting or controverting an issue without a basis in law or fact); *id.* r. 32:3.3(a)(1) (knowingly making false statement of fact or law to a tribunal); *id.* r. 32:3.4(a) (unlawfully altering a document or other material having potential evidentiary value); *id.* r. 32:8.4(c) (dishonesty, fraud, deceit, or misrepresentation); *id.* r. 32:8.4(d) (conduct prejudicial to the administration of justice). Sporer claims that he angrily made his handwritten annotations upon receipt of Duffy's September 24 settlement letter and forwarded the annotated version to Duffy by first-class mail, fax, and hand delivery on September 27. The district court and the commission both found that Sporer's assertions were untrue and that the annotated letter was not generated at the time suggested by Sporer and, in any event, was not sent to Duffy as claimed by Sporer.

There are a number of features in the record that make Sporer's assertions with respect to the annotation of the September 24 settlement letter difficult to believe. As Sporer himself concedes, lawyers do not

ordinarily respond to settlement letters by scribbling handwritten annotations and returning them to the sending party by multiple means in nonemergency situations. Sporer responds by claiming he was "in a hurry" and angry at Duffy upon receipt of the September 24 settlement letter and was trying to make a point by responding in handwriting with exclamation marks.

But as noted by the commission, Duffy's position expressed in his September 24 letter making clear that Linda was unwilling to surrender her share of retirement benefits to settle pending issues in the divorce proceeding was hardly surprising or unanticipated. There was a pending contempt proceeding arising from Gary's failure to pay the $23,835 as ordered by the district court. Gary was thus facing a day of reckoning. In September of 2012, Gary had no obvious defense to the contempt proceeding. He had not complied with the court order to pay Linda $23,835 within thirty days of the decree. Yet, Gary was offering Linda only about $3000 in additional dollars with which Sporer sought to obtain a release of over $100,000 in retirement assets and benefits. If anyone had an unreasonable settlement position, it was Gary. It just seems improbable that Sporer was outraged by Duffy's unsurprising and entirely predictable position as expressed in the September 24 settlement letter.

Sporer suggests that at the time he received the September 24 settlement letter from Duffy refusing to surrender Linda's share of retirement assets under the divorce decree, Gary was in a strong position in the litigation and Linda was desperate for funds. These assertions are not supported by the record. Indeed, it appears that it was Gary who was cash strapped and in a weak position. Although Gary had appealed the divorce decree, he failed to file a supersedeas bond and, as a result,

he was obligated to pay Linda the approximately $23,835 in cash within thirty days of the decree. Gary had missed the deadline and was facing a contempt proceeding for which he had virtually no defense. Although results on appeal cannot be predicted with certainty, there is no reason to think from the record developed in this proceeding that Linda was in a particularly exposed position on the divorce appeal. The claims against Duffy and Linda for stealing records, due process violations, and RICO violations, even if they were made at the time, are largely bluster and are not of sufficient merit to shift the relative position of the parties in the settlement discussions. The notion that Linda was taking an unrealistic position that provoked an angry, handwritten note from Sporer upon receipt of Duffy's September 24 letter is not supported in the record.

In order to counter Duffy's testimony that he had never seen the September 24 letter with Sporer's handwritten annotations, Sporer claimed to have served Duffy through fax, mail, and hand delivery. Sporer was unable, however, to provide any documentation regarding service by fax. He had no printout or mechanically generated confirmation that he sent the document to Duffy shortly after receiving the September 24 letter. Sporer also had no documentation that the September 24 settlement letter as annotated by him was ever placed in the mail. It is true, of course, that office procedures occasionally break down, but the lack of documentation here, when cumulatively combined with other factors, further undermines any claim that Sporer sent the document to Duffy at any time.

Sporer also claimed that the document was hand delivered to Duffy's office. This led to curious testimony from two persons, one a former paralegal in Sporer's office and another a friend of Sporer's who wanted to get involved in the business of serving legal papers. Both

claimed to have hand delivered the September 24 letter with Sporer's annotations to Duffy's office. It is doubtful that the document was hand delivered twice. The fact that two witnesses improbably claimed to have hand delivered the September 24 letter gives rise to an inference that it may not have been delivered once. In any event, Duffy denied ever receiving the document, testimony credited by the district court and the commission.

The fact that the September 24 settlement letter with Sporer's annotations did not appear at the mediation is also a curious event. Duffy used an unadorned copy of his September 24 letter to demonstrate to the mediator that when Linda cashed Gary's check, Sporer understood that he and Linda did not intend to extinguish Linda's rights to her share of Gary's retirement accounts and benefits awarded by the district court. But Sporer did not counter with his marked-up version of the document. It may well be that Sporer and or his client wished to take a hard line in the mediation, but if Sporer had in fact sent the marked-up copy of the September 14 settlement letter to Duffy prior to Linda's cashing of Gary's check, disclosure of this fact would have strengthened Sporer's hand and would have been consistent with a hardball approach to the mediation.

In considering the question of whether the document was ever sent to Duffy, it is important to note that Duffy denied seeing it before it was listed as an exhibit in April 2013. Of course, Sporer challenged Duffy's testimony. But as between Sporer and Duffy, the district court found Duffy to be more credible. The commission further found that Duffy was credible in his testimony that he had not seen the September 24 settlement letter with Sporer's handwritten note before it was produced by Sporer before the scheduled April 23, 2013 contempt hearing. We have said that this court "gives special weight to the commission's

findings concerning the credibility of witnesses." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bowles*, 794 N.W.2d 1, 3 (Iowa 2011).

The most troublesome testimony before the commission, however, came from Flanagan. She clearly linked Sporer's irritation with Duffy and Sporer's writing of notations on a document with Duffy's letterhead to the cashing of a check without a signed release, which occurred in October. Clearly, Flanagan's testimony, as pointed out by the commission, is inconsistent with Sporer's position that he sent the marked-up copy of Duffy's September 24 settlement letter to Duffy on September 27.

Consistent with Flanagan's testimony, it is striking that in the contempt proceeding, Sporer characterized exhibit 4—the version of Duffy's September 24 settlement letter with his notations—as "October 23, 2012 note, Sporer to Duffy." Sporer now claims exhibit 4 was mislabeled. In light of the testimony of Flanagan, we think it more likely that the original date placed on exhibit 4 by Sporer may have been quite accurate.

In addition, there is Gelbowitz's December 10, 2012 call to Duffy's office advising that Sporer was meeting with Gary and that the QDRO documentation would be coming soon. Gelbowitz testified that she was acting on her own when she contacted Duffy's office and was responding to constant bombardment from Duffy's office about the QDRO matter. We think it doubtful, however, that Gelbowitz was flying blind when she called Duffy's office. Gelbowitz obviously routinely communicated with Sporer about the Propstein file. It is difficult to believe that she was not generally aware of its status, particularly when she testified that she was present when Sporer blew up over the settlement issues and wrote his notations on the September 24 settlement letter with a red Sharpie.

Sporer defends his conduct in part by suggesting that it would make no sense for him to testify falsely about an inconsequential document. But the marked-up version of the September 24 settlement letter and its claimed delivery to Duffy were not inconsequential. If Sporer had sent the marked-up September 24 settlement letter to Duffy on September 27—well before Linda cashed the settlement check on October 10—the case for accord and satisfaction or ratification would have been enhanced. The last communication on the settlement would not have been from Duffy but from Sporer. Sporer would thus have a better shot at establishing accord and satisfaction or ratification because he could argue that Duffy and Linda knew that Gary still insisted that the payment of the $27,000 would be made only with a full release of all claims, including the award of retirement assets and benefits in the divorce decree.

In light of all the above, we thus find that the Board has proved by a clear and convincing preponderance of the evidence that the September 24 settlement letter with the Sporer notations was not generated on September 27 and was not provided to Duffy on that date. False statements to a tribunal, of course, may be orally made to the court. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hearity*, 812 N.W.2d 614, 621 (Iowa 2012). As a result, Sporer violated rule 32:3.3(a)(1) (false statements to a tribunal) and rule 32:8.4(c) (misrepresentation or deceit) by representing that the September 24 settlement letter with his handwritten notions was generated on September 27 and sent to Duffy on that date.

We also believe the Board established by a clear and convincing preponderance of the evidence that Sporer's conduct violated rule 32:8.4(d). With respect to the claim that Sporer sent the September 24

settlement letter with his annotations to Duffy on September 27, the district court in the contempt proceeding expended considerable time and effort evaluating the assertion. We therefore conclude that Sporer's conduct interfered with the efficient operation of the judiciary by advancing his false assertions regarding the annotated version of the September 24 settlement letter.

Like the commission, however, we decline to find a violation of rule 32:3.4(a) related to alteration of documents. In a sense, of course, Sporer did alter the September 24 settlement letter. But Sporer never claimed that he did not alter the document. Indeed, he represented to all that exhibit 4 was, in fact, a copy of the September 24 settlement letter with his later handwritten notes added to it. We think the commission got it right when it declined to find this rule violation.

**C. Sanction.** In considering sanctions, we consider both aggravating and mitigating circumstances. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Iversen*, 723 N.W.2d 806, 810 (Iowa 2006). As the commission has correctly pointed out, timely cooperation with the Board is a mitigating circumstance in this case. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Khowassah*, 837 N.W.2d 649, 657 (Iowa 2013).

There are, however, significant aggravating circumstances. Sporer is an experienced practioner. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wright*, 758 N.W.2d 227, 231 (Iowa 2008). We have found he committed multiple violations of our rules. *See Netti*, 797 N.W.2d at 607. He has a prior disciplinary history involving somewhat less egregious conduct, but which also involved a misrepresentation by Sporer, albeit to a client. Prior public reprimands are an aggravating factor in imposing discipline. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Beek*, 757 N.W.2d 639, 643 (Iowa 2008).

Sporer's conduct in this case is somewhat similar to *McGinness*, 844 N.W.2d 456. In *McGinness*, an attorney falsified a certificate of service attached to discovery requests, sent them to opposing counsel, and then defended the validity of the certificates in a judicial proceeding. *Id.* at 462. We suspended McGinness for six months. *Id.* at 467. Similarly, in *Committee on Professional Ethics & Conduct v. Bauerle,* we suspended the license of an attorney for six months for backdating partnership documents and providing a false notarization. 460 N.W.2d 452, 453–54 (Iowa 1990); s*ee also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Liles*, 808 N.W.2d 203, 206–07 (Iowa 2012) (imposing sixty-day suspension when lawyer forged witness's signature on will and files in probate proceeding); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Stein*, 586 N.W.2d 523, 526 (Iowa 1998) (imposing 180-day suspension on lawyer who changed certificate of service of pleadings at both trial and appellate levels, among other violations).

Here, Sporer may have believed he erred by providing Duffy with the $27,000 settlement check without clearly rejecting Duffy's September 24 settlement letter. And, he may have realized that he erred when he dismissed Gary's appeal without a signed settlement agreement. He may have been so wrapped up in his enmity with Duffy that his ethical judgment became clouded. Or, he may have had a difficult client who took unreasonable positions and expected his lawyer to bail him out. We may never know the answer to these questions, but we do know that we cannot tolerate lawyers making false representation to tribunals about evidence in a case.

We think it clear that Sporer's conduct requires a significant suspension. Based on our review of the record, we suspend Sporer's license to practice law for six months.

**IV. Conclusion.**

For the above reasons, we suspend Sporer's license for a period of six months from the date of this opinion without the possibility of reinstatement. The suspension applies to all facets of the practice of law, as provided by Iowa Court Rule 34.23(3), and requires Sporer to notify his clients, as provided by Iowa Court Rule 34.24. Upon any application for reinstatement, Sporer must establish that he has not practiced law during the suspension period and that he has complied with the requirements of Iowa Court Rule 34.25. The costs of this proceeding are assessed to Sporer pursuant to Iowa Court Rule 36.24(1).

**LICENSE SUSPENDED.**