# IN THE SUPREME COURT OF IOWA

No. 18–2191

Filed May 10, 2019

Amended May 14, 2019

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**PAUL A. CAGHAN,**

Respondent.

On review of the report of the Iowa Supreme Court Grievance Commission.

Grievance commission recommends attorney be ordered to cease and desist practicing law in Iowa for one year. **ATTORNEY ORDERED TO CEASE AND DESIST FROM THE PRACTICE OF LAW IN IOWA.**

Tara van Brederode and Wendell J. Harms, for complainant.

Paul A. Caghan, Chicago, Illinois, pro se.

**APPEL, Justice.**

In this case, the Iowa Supreme Court Attorney Disciplinary Board (Board) charged an attorney who appeared pro hac vice in Iowa proceedings with violating Iowa Rules of Professional Conduct 32:3:1 (prohibiting lawyer from bringing a frivolous proceeding or controverting a frivolous issue), 32:3.3(a)(1) (prohibiting lawyer from knowingly making or failing to correct false statements of material fact or law to a tribunal), and 32:8.4(d) (prohibiting lawyer from engaging in conduct prejudicial to the administration of justice).

The charges arise out of Iowa litigation in which an out-of-state attorney admitted pro hac vice claimed, among other things, that his clients lacked knowledge of an Iowa foreclosure proceeding and, as a result, could not be precluded from bringing a separate fraud action arising out of the same transaction that gave rise to the foreclosure proceeding. In addition, the attorney supported his fraud action by claiming that his clients were without counsel at a key stage of the negotiations with the bank prior to the institution of the foreclosure. Finally, the attorney asserted that his clients were defrauded by "phony court orders" foisted upon them by the defendants.

After granting summary judgment in the fraud action adverse to the attorney's clients, the district court found the above assertions were made "falsely and in bad faith" in an attempt to avoid the defendants' motion for summary judgment. The district court imposed sanctions of $123,359.60 against the attorney and his clients. The district court also entered a monetary sanction of $2500 against an Iowa attorney serving as local counsel.

Proceedings were instituted by disciplinary authorities. After a hearing, the Iowa Supreme Court Grievance Commission (commission)

found that the Board established the alleged violations of the Iowa Code of Professional Conduct by a convincing preponderance of the evidence and recommended that the court enter an injunction prohibiting the attorney from practicing law in Iowa for at least one year. The commission further recommended that the injunction not be lifted until the sanctions in the matter had been satisfied in full.

For the reasons expressed below, we affirm the commission's findings and conclusions regarding the violations. We conclude that the proper sanction for these violations is an injunction prohibiting the attorney from practicing law within the State of Iowa for six months. We also order that the injunction not be lifted until the attorney demonstrates to the satisfaction of the Board that the sanctions imposed in the fraud case have been satisfied.

## I. Factual and Procedural Background.

**A. Introduction.** Based on our review of the record, we find the following facts. Paul A. Caghan has been licensed as an attorney in Illinois since 1979. At the time of the allegations in this complaint, Caghan maintained an office in Cook County, Illinois.

Caghan has no history of disciplinary action in Iowa. In 1993, however, he was denied admission to the Indiana state bar because of outstanding debts. He was sanctioned in the past by an Ohio court in the amount of $141,475.63 for frivolous conduct and by an Illinois court in the amount of approximately $38,000 for filing a frivolous appeal.

The lender involved in the transaction that gives rise to this proceeding, American Bank and Trust Co., is a Quad Cities bank. Dan Jaros, the bank's chief lending officer, was responsible for the transaction in question. The borrower, RAAJ Corp., is an Iowa corporation. At all times relevant, its registered agent in Iowa was attorney Jack Dane. Kirit

Madhiwala is president and a director of RAAJ. Jayprakash Upadhyay is secretary, treasurer and a director of the corporation. Madhiwala and Upadhyay also own RAAJ. Madhiwala and Upadhyay were guarantors on the American Bank and Trust loans.

**B. Negotiation of Forbearance Agreement.** The allegations in the Board's complaint arose out of financing arrangements related to the Bettendorf Ramada Inn. Beginning in 2006, RAAJ borrowed in excess of $3 million from American Bank and Trust to acquire, operate, and renovate the hotel. The loans were secured by real estate mortgages on the hotel and related real estate. The principal shareholders of RAAJ— Madhiwala and Upadhyay—personally guaranteed the loans.

In January 2014, the loans were delinquent. The parties entered into negotiations for a forbearance agreement. In the forbearance negotiations, RAAJ was represented by Dane. Thomas Pastrnak represented the bank.

On March 18, Pastrnak advised Dane that the bank had determined to forbear further collection activities provided certain terms and conditions were met. In order to agree to forbear, the bank required that the borrower agree to a forbearance agreement and a consent order appointing a receiver. Pastrnak sent Dane a set of documents for his review. On March 25, Dane returned executed documents to Pastrnak.

On April 1, Pastrnak wrote Dane regarding the forbearance documents. Some of the documents executed by Dane's clients had blanks that were not completed. Pastrnak asked Dane for his permission to establish March 27, 2014, as the start date and September 27, 2014, as the expiration date of the forbearance agreement. He also asked Dane whether he could write in March 25, 2014, as the date for ordering an appraisal. Finally, with respect to the consent order, Pastrnak told Dane

that the bank failed to remove certain language from the first paragraph. Specifically, the bank sought to provide that the consent order would be filed in "an action in equity by American Bank" rather than in "an action in equity by American Bank to foreclose Mortgages given to American Bank by the Borrower." Pastrnak asked whether it was okay to make that change in the consent order without affecting the signature page.

Dane responded to the proposed changes by email on April 1. Dane stated he did not have a problem with the proposed changes and had recommended them to the guarantors of the debt, but he needed their express consent for any changes. He asked Pastrnak to "bear with [him]."

Dane followed up with a subsequent email on April 4 stating, "I have authority from all guarantors to insert the dates requested by American bank." He did not expressly address the question of the changed language in the consent order. Dane did, however, ask Pastrnak to send a fully executed copy of the agreements for him to send to his clients. On April 7, Pastrnak's assistant sent Dane fully executed copies of the documents that included the changed language in the consent order.

**C. Negotiations for Sale, Acceleration of Loan, and Filing of Actions in Illinois and Iowa.** For a period of months during the forbearance period, efforts were made to find a buyer for the hotel property. In July, RAAJ found outside financing that might take over part of the debt. However, the proposed transaction would require the bank to write off $700,000. The bank had no interest in this haircut.

In the fall of 2014, the parties pursued the possibility that Min Jung Kim, known as Steve Kim, and his company, SM Hospitality MGT Inc., might purchase the hotel. The bank's executive committee met several times to consider the outlines of a potential transaction, and in September, the bank provided a commitment letter outlining the terms of a transaction

that the bank would be willing to consider. The forbearance agreement was set to expire, however, on September 27, and the bank elected not to extend it beyond September 30.

On October 2, 2014, Dane sent an email to Pastrnak stating that he believed the bank had a deal for SM Hospitality to assume the RAAJ obligation and asking for details. Pastrnak responded with an email on October 8. The October 8 email discussed a potential transaction with Kim and SM Hospitality and provided some draft documents. Pastrnak emphasized that the bank had not yet reviewed the documents and that they were subject to revision. The documents included a management agreement and a purchase and sale agreement. Pastrnak stated, "Hopefully, I'll have the financing documents ready by the end of this week, but American Bank would like to have the buyer begin management while we await comments to the Agreements as well as the financing documents when circulated."

On October 15 and 16, Pastrnak's colleague, Troy Venner, exchanged emails with Dane related to the potential transaction. On October 15, Dane asked Venner for the purchase price and how the proceeds of any sale would be applied. On October 16, Venner provided the information which showed that the seller would be responsible for a deficiency obligation of $49,009. Dane responded that day with the declaration that "[t]he sellers will not agree to a deficiency."

The transaction became further clouded when, on October 20, Dane provided a signed management agreement for SM Hospitality to take over operations of the hotel but made it subject to an addendum. The bank rejected the terms of the addendum.

On November 21, the bank decided to press for resolution by issuing a notice of acceleration on the loans based upon alleged defaults.

According to Pastrnak, the bank was trying to mix everything up to get a deal. On November 25, Dane sent an email to Venner acknowledging acceleration of the loans and stating that he did not understand what was going on. Dane sought further information about the status of the potential transaction, raised questions about a debit of $50,000 from the RAAJ account, and stated,

> It is our understanding that Mr. Kim assumed control of the hotel at the direction of Mr. Jaros [a bank officer responsible for the credit line], that Jay and Frank were kicked out with the knowledge and consent of Mr. Jaros, and fund belonging to Raaj were seized by either Mr. Kim or the bank and some were sent back for reissue.

Dane further declared, "[I]t is our position that the bank has failed to honor its commitments and has acted beyond its authority."

Venner's same-day response was an attempt to set up a meeting for the following week. On December 2, Dane told Venner that his clients wanted to attend and asked if Jaros could attend as well.

On December 1, however, RAAJ and its owners filed an action against the bank and various individuals in Cook County, Illinois, alleging fraud. The plaintiffs in the Illinois fraud action were represented by Caghan. The bank called off any further meetings in light of the Illinois fraud action.

The bank's next action was to file a foreclosure action in Scott County, Iowa, on December 26, 2014. The bank also requested the appointment of a receiver and alleged that RAAJ and its guarantors had consented to the appointment of a receiver in a prior forbearance agreement. Finally, the bank requested the court set a hearing on the application for the appointment of a receiver. The court granted the application and set a hearing for January 29, 2015.

**D. Prosecution of Scott County Foreclosure Action and Dismissal of Illinois Fraud Action.** Pastrnak and Venner represented the bank in the Scott County foreclosure action. Dane, however, told Venner that he did not know whether he would be representing RAAJ and the guarantors in the foreclosure action. He did not file an appearance on their behalf in the foreclosure action.

The bank served the original notice, foreclosure petition, application for the appointment of a receiver, and order setting a hearing on Dane, who was the registered agent for RAAJ, on December 31, 2014. On January 8, 2015, the bank served the Scott County foreclosure documents on Madhiwala by serving his wife at an address in Skokie, Illinois. On January 12, the bank served the documents on Upadhyay by serving his daughter-in-law at an address in Winthrop Harbor, Illinois.

The January 29 hearing proceeded as scheduled. The district court appointed a receiver for the property. Neither RAAJ, Madhiwala, nor Upadhyay appeared either personally or through counsel. Jill Dykes, an assistant for the Pastrnak firm, served copies of the order by U.S. mail on Dane, Caghan, Madhiwala, and Upadhyay. No mail was returned undelivered.

After having initiated the Scott County foreclosure proceedings and obtained the appointment of Kim as receiver, the bank turned to address the Illinois fraud action filed by Caghan on behalf of RAAJ and its guarantors. The bank filed a motion to dismiss or to transfer, specifically alleging the Scott County foreclosure action brought by the bank against RAAJ and the guarantors. In support of the motion, the bank filed an affidavit by Jaros, the bank's chief lending officer, averring among other things that "a Petition in Foreclosure was filed on behalf of [the bank] in Scott County, Iowa, on December 26, 2014."

In response to the bank's motion to dismiss the Illinois fraud action, Caghan filed documents in the Illinois fraud action, including an affidavit from Madhiwala. Madhiwala stated, under oath, "My lawsuit against [the bank] was filed on December 1, 2014, which was prior to the Iowa lawsuit being filed by [the bank]." The affidavit thus asserted that RAAJ, Madhiwala, and Upadhyay had won the race to the courthouse.

Further, the Madhiwala affidavit explicitly attacked the Jaros affidavit filed in the Illinois action. The Madhiwala affidavit asserted that a statement made by Jaros regarding prior negotiations "in his affidavit is erroneous and mistaken." The Madhiwala affidavit thus shows familiarity with the Jaros affidavit. As noted, the Jaros affidavit recited facts about the filing of the Scott County foreclosure action.

On April 2, the bank filed a motion for summary judgment in the Scott County foreclosure action. The Pastrnak firm sent copies of the motion by U.S. mail to Dane, Caghan, Madhiwala, and Upadhyay. No mail was returned undelivered. No one, however, appeared on behalf of RAAJ, Madhiwala, or Upadhyay.

On April 20, the district court granted the bank summary judgment in the Scott County foreclosure matter. The court found that each of the defendants had been served in accordance with the rules of civil procedure and that it had in personam jurisdiction over RAAJ, Madhiwala, and Upadhyay. The Pastrnak firm provided copies by U.S. mail to Dane, Caghan, Madhiwala, and Upadhyay. No mail was returned undelivered.

On September 11, 2015, the bank filed an affidavit of protective advances in the Scott County foreclosure action. Once again, the Pastrnak firm provided copies by U.S. mail to Dane, Caghan, Madhiwala, and Upadhyay. No mail was returned.

After the bank bought the property at the resulting sheriff's sale and on September 15, the sheriff issued a deed conveying the hotel property to the bank. On January 11, 2016, the bank filed a motion to discharge the receiver, and on January 12, 2016, the bank filed a motion for confirmation of deficiency judgment. The Pastrnak firm provided copies of the January 11 and 12 documents to Dane, Caghan, Madhiwala, and Upadhyay by U.S. mail without any return from the post office.

The bank was also successful in the Illinois fraud action. The Illinois court dismissed the lawsuit and directed the plaintiffs to refile it in Scott County, Iowa, within six months of the entry of the order of dismissal.

**E. The Filing of Scott County Fraud Action and the Bank's Defense of Issue Preclusion Arising Out of the Scott County Foreclosure Action.** RAAJ and the guarantors filed a fraud action in Scott County, Iowa, on November 4, 2015. The original lawyer in the action was an Iowa attorney, Larry Thorson. The lawsuit alleged that the bank induced the plaintiffs "with false agreements, phony court orders and misrepresentations" and "used the plaintiffs as a mere business conduit, instrument and tool solely for its own objective, benefit, and advantage, to the detriment of the plaintiffs." An amended pleading claimed that the false documents included a "purported Consent Order" and a "supposed Management Agreement."

The bank filed a motion to dismiss the action, arguing that the petition was too vague to provide fair notice of the claims. The district court denied the motion to dismiss, stating that the pleading was sufficient. The bank responded with an answer and affirmative defenses that included the assertion that "[r]es judicata, or claim preclusion, bars the Plaintiffs' claim which could have been fully and fairly adjudicated in [the Scott County foreclosure action]."

In the initial disclosures in the Scott County fraud case, the RAAJ plaintiffs identified various documents in the Scott County foreclosure action, including the original notice and application for a receiver, as documents that may form the basis of testimony or expert opinions at trial. The bank also identified various pleadings related to the Scott County foreclosure action in its initial disclosures. RAAJ lawyer Thorson was familiar with the initial disclosures in the Scott County fraud case.

On May 27, 2016, Caghan applied for permission to represent the RAAJ plaintiffs pro hac vice in the Scott County fraud case. Although Caghan disclosed unfavorable facts in his application regarding the denial of admission to the Indiana bar and sanctions levied against him in Ohio and Illinois courts, the bank did not resist the application. The district court granted the application on June 13.

On July 2, Caghan sent the bank an exhibit list. The list identified various filings in the Scott County foreclosure action.

The RAAJ plaintiffs answered interrogatories and a request for document production in the Scott County fraud case. The interrogatory answers and the response to the request for production both identified various filings in the foreclosure case as trial exhibits. Madhiwala and Upadhyay were identified as providing or assisting the answers to interrogatories and signed verifications stating that the answers were true and correct.

On November 9, the bank filed a motion for summary judgment in the Scott County fraud case claiming, among other things, that the RAAJ plaintiffs' fraud claim was barred by claim preclusion. The bank took the depositions of Madhiwala and Upadhyay during the pendency of the summary judgment motion on November 22 and 29. Madhiwala and Upadhyay testified that, prior to their depositions, they had never heard of

the Scott County foreclosure action. This testimony led to vigorous postdeposition discussion between counsel for the bank and Caghan.

On December 5, the RAAJ plaintiffs filed a resistance to the bank's motion for summary judgment. The RAAJ plaintiffs claimed that Dane was not their lawyer after October 9, 2014, and that they were never served in the Scott County foreclosure action. Madhiwala and Upadhyay again claimed that they were not aware of the Scott County foreclosure action until their depositions were taken on November 22 and 29, 2016.

**F. Bank's Motion for Sanctions in Scott County Fraud Action.** In response to the RAAJ plaintiffs' filings resisting summary judgment, the bank filed a motion for sanctions against Caghan and the RAAJ plaintiffs in connection with the filings. The motion for sanctions covered four discrete subject areas.

First, the bank sought sanctions against Caghan for claiming that the RAAJ plaintiffs had no knowledge of the Scott County foreclosure action. The bank characterized the RAAJ plaintiffs' position that they were unaware of the Scott County foreclosure action prior to November 2016 as "a ridiculous, desperate and bad faith attempt to resist [the bank's] claim preclusion argument." The bank claimed that there were at least sixteen instances where the RAAJ plaintiffs would have learned, either directly or through counsel, that the bank had filed the Scott County foreclosure action. The bank attached to its sanction motion various exhibits that the bank claimed demonstrated the RAAJ plaintiffs had knowledge of the Scott County foreclosure action.

Second, the bank sought sanctions against Caghan for "claiming inadequate and/or non-existent service of process" on his clients in the Scott County foreclosure action. The bank presented the court with an email from Dane dated December 7, 2016, in which he confirmed that he

had been served on December 31, 2014, with papers related to the Scott County foreclosure action. The bank also submitted affidavits of process servers detailing their efforts to serve process on the guarantors by service to family members at known addresses.

Third, the bank urged the court to impose sanctions on Caghan for claiming that the consent order was somehow forced on the RAAJ plaintiffs in October 2014 as part of an alleged fraud when, in fact, the consent order was part of the March 2014 forbearance agreement. The bank submitted both (i) excerpts of Madhiwala's deposition in which he agreed that he signed the consent order in March 2014 and (ii) various correspondence related to the negotiation of the forbearance agreement.

Fourth, the bank sought sanctions on Caghan for claiming that Dane was not the attorney for the RAAJ plaintiffs after October 9, 2014. The bank attached various correspondence between the bank and Dane in December 2014 regarding negotiations with the bank on behalf of the RAAJ plaintiffs. The bank also attached an excerpt of Madhiwala's deposition in which he testified that Dane continued to represent the RAAJ plaintiffs until December 2014.

Caghan resisted the motion for sanctions. He claimed that there was overwhelming evidence that the RAAJ plaintiffs had no knowledge of the Scott County foreclosure action until the November 2016 depositions were taken. Caghan also repeated his claims that service was not effective on RAAJ, Madhiwala, or Upadhyay. Caghan further reiterated his claim that the evidence supported each element of fraud. Finally, Caghan argued that lawyer Dane did not represent RAAJ after October 9, 2014.

**G. District Court Grants Bank's Motion for Summary Judgment in the Scott County Fraud Action Against RAAJ Plaintiffs.** In January 2017, the district court granted the bank's motion for summary judgment

in the Scott County fraud action. The district court found that the RAAJ plaintiffs were precluded from bringing the fraud action because they failed to raise their claims in the foreclosure action.

Notwithstanding the issue preclusion ruling, the district court addressed the RAAJ plaintiffs' allegations of fraud. As to the allegations of fraud, the district court concluded,

> There is simply no evidence in the summary judgment record to support a reasonable inference for a finding that [the bank] knowingly made a false representation to Plaintiffs with the intent to deceive Plaintiffs in order to dispossess Plaintiffs of the Hotel.

The district court specifically rejected the RAAJ plaintiffs' phony court orders theory, concluding that there was no evidence that the consent order, signed in March 2014 as part of the forbearance agreement, was used by the bank to trick the plaintiffs in October 2014 into giving up possession of their hotel. The district court rejected other assertions concerning fraud raised by the RAAJ plaintiffs.

**H. District Court Ruling on Bank's Motion for Sanctions.** In February 2017, the district court entered an order on sanctions. The district court analyzed Caghan's conduct under Iowa Rules of Civil Procedure 1.981(7) (concerning affidavits presented in bad faith or solely for purpose of delay) and 1.413(1) (stating that counsel's signature is a representation that pleading is well founded in fact and law).

The district court found that the assertions by Caghan in resistance to the motion for summary judgment suggesting that the RAAJ plaintiffs were not aware of the Scott County foreclosure action were directly contradicted by communications sent by counsel for the bank and by references to the foreclosure action in the plaintiffs' own documents. As a

result, the court concluded that sanctions were appropriate for this factual assertion.

The district court next considered the claim that the bank created phony court documents. Such claims, according to the district court, were untenable and fabricated in order to sustain the RAAJ plaintiffs' cause of action.

The district court further found that there was no reliable evidence that Dane's representation of the RAAJ plaintiffs ended in October 2014. The court said, "Plaintiffs offer no evidence of termination of Dane's engagement or objection to his continued representation on their behalf after October 9, 2014."

On February 25, Caghan filed a resistance claiming that the district court could not enter sanctions or set any other hearing dates after the district court granted the bank's motion for summary judgment. The bank, citing *Board of Water Works Trustees v. City of Des Moines*, 469 N.W.2d 700, 702 (Iowa 1991), replied. The bank also provided the district court with a letter it received from Upadhyay and Madhiwala on March 16. In the letter, Upadhyay and Madhiwala declared, "We never understood [Caghan's] explanation or reasoning" and "[W]e should have known better that our attorney's assertion of fraud was a[n] extremist explanation of what should have been a reasonable defense."

The district court held a hearing on April 19 to consider the question of what sanctions should be imposed. Madhiwala, Upadhyay, and Thorson attended, while Caghan did not.

On April 28, the district court entered sanctions against Caghan, Upadhyay, and Madhiwala in the amount of $123,359.60, the cost of the bank's defense of the two fraud lawsuits. The district court declared that Madhiwala and Upadhyay "were willing stooges in executing the false,

misleading and wrongful statements of fact asserted by them and through their attorney, Paul Caghan." The district court concluded that it was "fully satisfied [Caghan] conspired with his clients to make false statements of fact for the purpose of misleading the tribunal."

The RAAJ plaintiffs did not appeal the district court ruling granting the bank's motion for summary judgment in the Scott County fraud claim. Further, neither Caghan, Madhiwala, nor Upadhyay appealed the district court order on sanctions.

## II. Proceedings Before the Commission.

**A. Introduction.** On April 27, 2018, the Board filed a complaint against Caghan. In the complaint, the Board alleged that Caghan in his representation of the RAAJ plaintiffs violated Iowa Rules of Professional Conduct 32:3.1, 32:3.3(a)(1), and 32:8.4(d).

The commission held a hearing on the matter on August 27–28. The Board admitted numerous exhibits by consent. The Board called Pastrnak, Venner, attorney Jonathon Fox, and Iowa District Court Judge Stuart Werling as witnesses. Caghan appeared pro se but did not call any witnesses.

**B. Ethical Violations.** After hearing the evidence, the commission found that the Board proved by a convincing preponderance of the evidence all three charges against Caghan. The commission found that there was no factual basis for Caghan's repeated assertions that the RAAJ guarantors had no knowledge of the Scott County foreclosure action before November 2016. The commission also found that there was no factual basis for the assertion made by Caghan that the consent order was signed in October 2014 when in fact it had been signed as part of a forbearance agreement in March 2014. The commission concluded that Caghan violated rule 32:3.1 by making bad faith assertions regarding his clients'

lack of knowledge of the Scott County foreclosure action and the allegedly fraudulent nature of the consent order that was negotiated as part of the forbearance agreement. The commission also concluded that Caghan violated rule 32:3.3(a)(1) because he "knowingly" made these false assertions. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Turner*, 918 N.W.2d 130, 150 (Iowa 2018).

Finally, the commission concluded that Caghan violated rule 32:8.4(d) by engaging in conduct prejudicial to the administration of justice. The commission concluded that Caghan's conduct impeded the efficient operation of the courts by wasting judicial resources on meritless claims. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 463 (Iowa 2014).

**C. Sanctions.** The commission considered both aggravating and mitigating factors in considering the proper sanction. As aggravating factors, the commission found that Caghan had prior similar disciplinary offenses. The commission also found that Caghan had refused to acknowledge even the possibility of wrongful conduct. In addition, the commission concluded that Caghan's answers and affirmative defenses suggested that he did not intend to pay the sanctions that had been levied against him.

Because of the nature of the offenses and the aggravating factors, the commission recommended that Caghan be enjoined from the practice of law in the State of Iowa for one year. The commission further recommended that any lifting of the injunction should be contingent upon satisfaction of the outstanding sanctions imposed by the district court in this case.

### III.  Standard of Review.

"Our review of attorney disciplinary proceedings is de novo."  *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 774 N.W.2d 301, 304 (Iowa 2009).  While we give respectful consideration to the findings of the commission, we are not bound by them.  *McGinness*, 844 N.W.2d at 461. The Board must prove alleged violations of disciplinary rules by a convincing preponderance of the evidence.  *Id.*

### IV.  Discussion.

**A.  Introduction.**  We begin our task by a review of the record in this case to determine whether the Board proved by a convincing preponderance of the evidence that Caghan committed the ethical violations as alleged by the Board.  If we determine that ethical violations occurred, we then proceed to consider the appropriate sanction.

### B.  Ethical Violations.

1. *Iowa Rule of Professional Conduct 32:3.1.*  The Board alleges violations of rule 32:3.1.  The rule states, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous . . . ."  Iowa R. Prof'l Conduct 32:3.1.

In reviewing the record, we recognize that an attorney is not subject to sanctions for merely making factual assertions or legal arguments that ultimately are unsuccessful.  *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Sporer*, 897 N.W.2d 69, 86 (Iowa 2017).  We expect zealous advocacy from our lawyers.  Indeed, our adversary system of justice depends upon it.  Yet our system also depends upon attorneys not gaming the system through the assertion of law or facts that the attorney knows are unsupportable.  As noted in comment 1 to rule 32:3.1,

> The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure. The law, both procedural and substantive, establishes the limits within which an advocate may proceed.

Iowa R. Prof'l Conduct 32:3.1 cmt. [1].

Several of our cases develop the contours of rule 32:3.1. In *Iowa Supreme Court Attorney Disciplinary Board v. Barnhill*, 885 N.W.2d 408, 414, 420 (Iowa 2016), we considered a case in which a lawyer claimed in an action brought by a client to enforce a fee arbitration award that she had reimbursed the client for the excessive fee. In fact, the lawyer had not done so. *Id.* at 414. The lawyer, of course, had personal knowledge that the amount had not been paid. *Id.* Further, the lawyer knew that her counterclaim for abuse of process was totally without merit as the lawyer had not satisfied the fee arbitration award and the adverse client's action to enforce the arbitration award was entirely justified. *Id.* at 420. We found a violation of rule 32:3.1 in this case. *Id.*

We also found a violation of rule 32:3.1 in *Sporer*, 897 N.W.2d at 85–86. In *Sporer*, an attorney testified that it was "unfathomable" to him that a legal secretary who arrived at his office to pick up papers associated with a divorce did not have authority to bind a client. *Id.* at 73, 85. We found that this remarkable assertion was a violation of rule 32:3.1. *Id.* at 86.

More recently, in *Turner*, 918 N.W.2d at 150, we considered whether an attorney violated rule 32:3.1 by filing baseless or frivolous pleadings during his representation of bankruptcy clients. The attorney's pleadings omitted required information, contained inaccurate information, and lacked client authorization. *Id.* at 136–38. We found the attorney's actions violated the rule. *Id.* at 150.

We now turn to the question of whether Caghan violated rule 32:3.1 by advancing the notion that his clients did not know about the underlying

foreclosure action. After the bank filed its motion for summary judgment in the Scott County fraud action urging application of claim preclusion, Madhiwala and Upadhyay filed affidavits and provided testimony claiming that they had no knowledge of the foreclosure action until November 2016 when their depositions were taken by the bank. Caghan sought to use this testimony to defeat application of claim preclusion arising out of the Scott County foreclosure action.

Ordinarily, when a client claims knowledge of certain facts, a lawyer is not required to function as judge and jury regarding credibility issues. But here, we are convinced that Caghan must have known that the testimony was simply not true. Under all of the facts and circumstances, it seems impossible that these sophisticated businessmen had no idea that the bank had commenced a foreclosure proceeding in Iowa. We come to this conclusion not because of one single circumstance that arouses suspicion that Madhiwala and Upadhyay may be lying, but on at least eight significant factors that compel the conclusion that they must have known about the underlying Scott County foreclosure action.

First, Dane, RAAJ's lawyer in negotiations with the bank, was personally served with the papers as registered agent for RAAJ on December 31, 2014. Madhiwala is president and a director of RAAJ, and Upadhyay is secretary, treasurer, and a director of the corporation. It strains credulity to believe that lawyer and registered agent Dane, after having been served with the papers related to the Scott County foreclosure action filed by the bank, did not advise the RAAJ principals about it.

Second, while there might be an argument that the bank did not successfully achieve service of the foreclosure action papers on Madhiwala and Upadhyay, the service was nevertheless of a character likely to inform them of the pending action. With respect to Madhiwala, a process server

served the papers on Madhiwala's wife at an address in Skokie that no one claims was not Madhiwala's home or residence. Caghan argued that the service was ineffective for lack of compliance with Illinois law, which Caghan asserts requires first class mail as part of service, but this legal question is beside the point for purposes of this disciplinary proceeding. The point here is that is seems very unlikely that Madhiwala's wife, after being served with papers related to the Scott County foreclosure action, would not have given Madhiwala the papers which were served that related to the hotel property which formed the basis of his livelihood.

As to Upadhyay, substituted service was achieved on his daughter-in-law at a motel in Windsor Heights, Illinois. Caghan asserted that this service was ineffective because Upadhyay did not reside at the motel but instead lived in a separate structure owned by the motel but not physically attached to the main structure. Perhaps the substituted service could be challenged under Iowa law for failure to achieve it at the home or place of abode of the person being served. But once again, that is not the question here. The question is whether Upadhyay would not have received the legal documents served on his daughter-in-law under the circumstances. That seems unlikely.

Third, in the Illinois fraud action, Madhiwala filed an affidavit after the bank moved to dismiss the case. In the affidavit, Madhiwala stated, "My lawsuit against [the bank] was filed on December 1, 2014, which was prior to the Iowa lawsuit being filed by [the bank]." The only action filed by the bank in Iowa related to Madhiwala was the Scott County foreclosure action. Further, in the affidavit, Madhiwala attacks an affidavit provided by Dan Jaros as containing inaccurate information. The Jaros affidavit, with which Madhiwala was apparently familiar, included narrative about the filing of the Scott County foreclosure. And, of course, Caghan was

representing Madhiwala and RAAJ in the Illinois fraud action, and we may thus presume his familiarity with Madhiwala's affidavit filed therein.

Fourth, Caghan was obviously fully aware of the Scott County foreclosure proceeding even though he may not have made an appearance in the proceeding itself. After Caghan filed the Illinois fraud action, the bank sent Caghan a courtesy copy of filings related to the Scott County foreclosure at his office by U.S. mail. It seems extremely unlikely that Caghan would not have discussed with his sophisticated business clients the Iowa filings and the relationship between the filings and the Illinois fraud action.

Further, the pleadings and discovery associated with the Illinois fraud action demonstrate that Caghan was well aware of the Scott County foreclosure proceedings. The plaintiffs' August 10, 2016 exhibit list in the fraud action identified documents previously filed in the Scott County foreclosure action. Additionally, the interrogatory answers identifying the Scott County foreclosure documents were verified as "true and complete" by Madhiwala and Upadhyay.

Fifth, events early in the Scott County fraud litigation suggest that Madhiwala and Upadhyay must have known about the Scott County foreclosure proceedings. The Scott County fraud action was filed by an Iowa lawyer, Larry Thorson. In initial disclosures in the case, Thorson, on behalf of his clients, identified documents related to the Scott County foreclosure proceeding as relevant to the fraud action. In assembling the disclosures, it is difficult to see how attorney Thorson would have not had communications with his clients about documents related to their claims.

Sixth, in June 2016, Caghan entered the Scott County fraud case as counsel for Madhiwala and Upadhyay. Again, Caghan was aware of the Scott County foreclosure action. Further, in the Scott County fraud

action, the plaintiffs hired two experts who generated reports that stated they had reviewed documents connected with the foreclosure action. Madhiwala and Upadhyay verified interrogatories describing the testimony of these experts.

Seventh, Madhiwala and Upadhyay each received a blizzard of documents by U.S. mail related to the foreclosure action. The mail was sent to Madhiwala's residence and, in the case of Upadhyay, to a motel where he received mail. None of the mail was returned as undeliverable. It may be questionable whether one, two, or even three pieces of U.S. mail actually get through to a party, and U.S. mail alone may be insufficient to support service of process. But the frequency of documents related to the foreclosure action sent on at least six separate occasions by the bank's representatives by U.S. mail to addresses where Madhiwala and Upadhyay receive mail makes it unlikely that they did not know about the foreclosure action.

Eighth, Madhiwala and Upadhyay attended the district court's hearing related to what sanctions should be imposed in the case. They heard oral argument presented by the bank's attorneys regarding why sanctions should be imposed not only on Caghan but also on them personally. The bank pressed the case that sanctions should be imposed based on the assertions by Caghan, Madhiwala, and Upadhyay that they did not know about the Scott County foreclosure proceedings.

At the close of the bank's presentation, the district court asked Madhiwala and Upadhyay whether they wished to add anything to the record. Neither of them defended their conduct or the claim that they had no knowledge of the Scott County foreclosure proceedings. Upadhyay told the court,

What our Attorney Paul Caghan asked us to do, I did, just like a doctor. You know, he said, "Take this medicine," so we take that medicine. So we followed his advice. And whatever he suggested that it should go like this, and we did that, Your Honor.

Based on the record, we think that there was not a good faith basis in fact for claiming that Madhiwala and Upadhyay had no knowledge of the foreclosure action. While none of the above eight factors individually, in isolation, would necessarily support such a conclusion, the cumulative effect of the totality of facts and circumstances makes the claim that Madhiwala and Upadhyay did not know about the foreclosure action absurd.

Further, we think Caghan, who was familiar with the underlying litigation, must have known it. He knew of the service on Dane and the attempted service on his clients, he knew that the bank sent copies of its filings in the action to his clients, he had to have been communicating with his clients about the posture of their fraud case, he must have reviewed the discovery in the fraud case and worked with his clients to comply with required disclosure, and he had to have known about Madhiwala's race-to-the-courthouse affidavit.

We can only conclude that Caghan's factual assertion that Madhiwala and Upadhyay had no knowledge of the Scott County foreclosure action was a fiction created to buttress Caghan's effort to avoid summary judgment on the ground that the issues in the fraud case were precluded because of the prior Scott County foreclosure case. We thus find that Caghan violated rule 32:3.1 as found by the commission.

We now turn to the question of whether Caghan violated rule 32.3.1 when he claimed that Madhiwala and Upadhyay were unrepresented when the bank allegedly engaged in fraudulent action beginning on October 8, 2014. Caghan was trying to paint a picture suggesting that the bank took

advantage of defenseless borrowers who were abandoned by counsel and fraudulently induced to surrender their property.

For starters, the paper trail does not support Caghan's assertion. Lawyer Dane remained involved in the discussions with the bank well after October 8. The paper trail also indicates that he was communicating with Madhiwala and Upadhyay about matters at least through December 1, 2014. In early December, Dane was attempting to arrange a meeting with his clients and Jaros, the bank's chief lending officer, in an attempt to resolve the dispute. Caghan was clearly aware of Dane's representation between October 8 and November 25 because email traffic between Dane and the bank's attorneys was provided to plaintiffs' experts in the Scott County fraud action. And more importantly, Madhiwala admitted in his deposition that Dane represented RAAJ at least through the beginning of December.

It is not clear exactly when Caghan knew that he could not claim that his clients were unrepresented in discussion with the bank, but certainly by the time of Madhiwala's deposition he knew that he could no longer press that assertion. And yet he continued to defend the claim in the litigation. As a result, Caghan violated rule 32:3.1.

We now turn to the question of whether Caghan is subject to discipline for making an assertion that the bank utilized a phony court order, namely, the executed consent order that was part of the March 27 forbearance agreement. Caghan claimed that the consent order in this case was a phony court order which his clients believed was part of a pending court action and that they had no choice but to abandon the property in October 2014 because of it. But that is not what happened.

The consent order was part of the March 2014 forbearance agreement. There is nothing unusual about it. As a term of the

forbearance agreement, the bank wanted a swift remedy in the event of a default under the agreement. The consent order was fairly presented to attorney Dane, who clearly understood its purpose and had no objection to it. Yet Dane made clear that he needed express approval from Madhiwala and Upadhyay before proceeding. He got that approval in late March or early April 2014. The document's origin had absolutely nothing to do with events in October, when the forbearance agreement had expired.

It may be, perhaps, that Madhiwala or Upadhyay had an incomplete understanding of the consent order. That incomplete understanding, however, was not caused by any statement or representation by the bank. The bank handled the documentation of the forbearance agreement and the consent order through lawyer Dane. Caghan had no evidence that someone from the bank made a misrepresentation related to the consent order in October.

In short, there was nothing phony about it. The consent order was a protective device held in reserve by the bank during the life of the forbearance agreement in the event of a default under the forbearance agreement. The forbearance agreement expired on September 27 and so did the consent order, which could be used solely in the event of default under the March 27 forbearance agreement. Caghan violated rule 32:3.1 by asserting that the consent order amounted to a phony court order that was part of a fraudulent scheme in October to oust the defendants from their property.

2. *Iowa Rule of Professional Conduct 32:3.3(a)(1).* The Board further alleges that Caghan violated rule 32:3.3(a)(1). This ethics provision states, "A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Iowa R. Prof'l Conduct

32:3.3(a)(1). Rule 32:1.0(f) in turn defines "knowingly" as "actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." *Id.* r. 32:1.0(f).

We considered a claim that an attorney violated this rule in *Iowa Supreme Court Attorney Disciplinary Board v. Casey*, 761 N.W.2d 53, 60 (Iowa 2009) (per curiam). In this case, an attorney representing two children as coexecutors of an estate filed documents with the district court and tax authorities stating that the deceased did not have a surviving spouse when, in fact, there was a surviving spouse and that spouse was specifically mentioned in the testator's will. *Id.* at 57, 60. We found that the conduct violated rule 32:3.3(a)(1). *Id.* at 60.

We think the evidence here establishes knowing violations of rule 32:3.3(a)(1). Caghan knew of all the facts and circumstances surrounding the litigation and must have understood that his clients' assertions—that they did not know about the Scott County foreclosure litigation—were not true. Caghan would have learned in discovery about the Dane paper trail and consequently that Dane did, in fact, continue to represent Upadhyay and Madhiwala until early December. Further, the phony court order claim packs a punch, but that is part of the problem. It packed a punch without any factual support. Caghan had access to the March 27 forbearance agreement and the consent order that was part of that agreement. Yet he hung onto the phony court order claim in resisting the bank's motion for summary judgment in the Scott County fraud case.

3. *Iowa Rule of Professional Conduct 32:8.4(d).* Rule 32:8.4(d) provides, "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." Iowa R. Prof'l Conduct 8.4(d). We have said that "there is no typical form of conduct" that violates the rule. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v.*

*Steffes,* 588 N.W.2d 121, 123 (Iowa 1999). The attorney's conduct must "hamper[] the efficient and proper operation of the courts." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kingery,* 871 N.W.2d 109, 121 (Iowa 2015); *see also McGinness,* 844 N.W.2d at 463. We think Caghan's assertions clearly made the underlying litigation unnecessarily complicated and contributed to a needless expenditure of court resources. We therefore find a violation of rule 32:8.4(d).

**C. Sanctions.**

1. *Authority over out-of-state attorneys appearing in Iowa proceedings.* As a preliminary matter, we note that this court has authority over out-of-state attorneys who appear in Iowa proceedings pro hac vice. Iowa Ct. R. 31.14(9)(a); *id.* r. 34.10(1). In *Iowa Supreme Court Attorney Disciplinary Board v. Carpenter,* 781 N.W.2d 263, 265, 271–72 (Iowa 2010), we enjoined a Minnesota attorney from the practice of law in Iowa for at least two years. Similarly, in *Iowa Supreme Court Attorney Disciplinary Board v. Mendez,* 855 N.W.2d 156, 160, 175 (Iowa 2014), we entered an injunction against an attorney, prohibiting him from practicing law in Iowa for at least sixty days.

2. *Appropriate sanctions in this case.* In evaluating sanctions, we consider aggravating and mitigating factors. We find aggravating factors include Caghan's experience as an attorney and his admitted previous violations related to frivolous proceedings. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Jacobsma,* 920 N.W.2d 813, 819 (Iowa 2018) ("Years of experience as an attorney can be considered an aggravating factor."); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kennedy,* 837 N.W.2d 659, 674 (Iowa 2013) (finding prior discipline to be aggravating factor). Caghan is not an attorney recently out of law school, and he has simply not learned from his past experiences about the importance of keeping his advocacy within

the bounds of the law. We also believe the fact that the record is devoid of any remorse is an aggravating factor. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Tofflemire*, 689 N.W.2d 83, 93 (Iowa 2004) (finding aggravating factor in attorney's refusal to take blame for her actions and attempt to shift the blame to others).

In other cases involving similar conduct, we have imposed sanctions ranging from three months to a year. For instance, in *Iowa Supreme Court Attorney Disciplinary Board v. Barry*, 908 N.W.2d 217, 221–22 (Iowa 2018), an attorney failed to file and serve a dissolution decree, misrepresented the status of the proceeding to his client for fourteen months, and ultimately prepared a fraudulent dissolution decree to which he attached a signature page bearing a judge's signature from a different case. The attorney presented the fraudulent decree to his client, after which judicial resources were expended investigating the deception. *Id.* at 226, 234. He also took advantage of a client in a vulnerable position. *Id.* at 234. We held the attorney's conduct violated our rules associated with diligence; keeping clients informed and responding to requests for information; criminal acts, in this case forgery, reflecting adversely on honesty, trustworthiness, or fitness as a lawyer; dishonesty, fraud, deceit, or misrepresentation; and conduct prejudicial to the administration of justice. *Id.* at 223–27. We suspended his license for one year. *Id.* at 234.

Another case, *Sporer*, 897 N.W.2d at 85, involved an attorney who testified under oath that the signature of an opposing counsel's secretary bound that counsel's client to a settlement agreement. In light of that conduct, we found the attorney knowingly made a false statement of fact or law to a tribunal, and asserted or controverted an issue without a basis in law or fact. *Id.* at 86. The attorney additionally claimed that he annotated a document sent by opposing counsel and provided it to

opposing counsel on the same date, which we found to be another instance of a false statement to a tribunal as well as misrepresentation or deceit. *Id.* at 89–90. As a result, his license was suspended for six months. *Id.* at 91.

In *Barnhill*, 885 N.W.2d at 419–20, an attorney argued in a different proceeding that another attorney committed abuse of process by not accepting multiple checks she purportedly sent and by filing a lawsuit against her instead. We found the argument without a plausible factual basis and therefore a violation of our rule against making frivolous claims. *Id.* The attorney also made numerous statements to a tribunal and third parties—including that a payment had been tendered and that she received documents at a date later than revealed by emails—which we found to be knowingly false in violation of our ethical rules against such conduct, as well as being conduct prejudicial to the administration of justice. *Id.* at 420–22. Further, because the attorney knowingly disobeyed a court order compelling discovery responses, we found violations of our ethical rules against knowing disobedience of a court order and failing to comply with an opponent's proper discovery request. *Id.* at 423. We suspended her license for six months. *Id.* at 426.

Other cases have involved lesser sanctions. In *Casey*, 761 N.W.2d at 60, we found the attorney knowingly made false representations to the court misrepresenting the marital status of a decedent. He had an obligation, we said, not to assist his clients in conduct he knew to be fraudulent. *Id.* The attorney also neglected his cases, prematurely withdrew probate fees, failed to comply with the board's investigation, and engaged in conduct prejudicial to the administration of justice. *Id.* at 59–61. As a result, we suspended his license for three months. *Id.* at 62–63. In *Iowa Supreme Court Board of Professional Ethics & Conduct v.*

*Hohnbaum,* 554 N.W.2d 550, 552 (Iowa 1996), we also imposed a three-month suspension when an attorney made misleading statements to the court and persisted in a defense position "that was patently frivolous."

Based on all the facts and circumstances of this case, we think an injunction enjoining Caghan from appearing pro hac vice in Iowa courts for at least six months is the appropriate sanction. We find Caghan's conduct less egregious than that in *Barry* but more egregious than that in *Casey* and *Hohnbaum.*

We also agree with the commission that before the injunction is lifted, Caghan must show that the sanctions levied in the case involving the RAAJ parties and the bank have been satisfied. We have no occasion to consider any potential issues surrounding the imposition of the monetary sanctions. No appeal was taken from the district court's sanction order. But we will not allow an enjoined out-of-state attorney to return to practice law in Iowa, even on a pro hac vice basis, when a final order imposing sanctions related to unethical conduct is unsatisfied.

### V. Conclusion.

For all the above reasons, we enjoin Caghan from the practice of law in this state for a period of at least six months. To appear pro hac vice after that time, Caghan must provide proof that the sanctions award against him in the Scott County fraud action has been satisfied.

**ATTORNEY ORDERED TO CEASE AND DESIST FROM THE PRACTICE OF LAW IN IOWA.**

All justices concur except Waterman, Christensen, and McDonald, JJ., who concur in part and dissent in part.

**WATERMAN**, **Justice (concurring in part and dissenting in part).**

I respectfully dissent from the majority's six-month sanction as too lenient for this Chicago attorney whose own lies and the lies told by his clients at his direction caused considerable harm to the opposing party, his own clients, and our court system. I would extend the injunction to at least one year as recommended by the Iowa Supreme Court Grievance Commission and the Iowa Supreme Court Attorney Disciplinary Board.

The majority correctly concludes that Paul Caghan violated our disciplinary rules prohibiting intentionally false statements to the court, frivolous claims, and conduct prejudicial to the administration of justice. But the majority's otherwise thorough review of the underlying litigation omits salient observations by the district court judge and fails to properly analyze our precedent on sanctions. The majority rests its six-month sanction on several cases involving less egregious attorney misconduct and lacking the harm to the victim and clients present here. I will begin with some choice words by the judge tasked with adjudicating the fraud action Caghan filed.

The district court found the claim by Caghan's clients that they were unaware of the Scott County foreclosure action until November 2016 was "demonstrably untrue." The judge said this about the fake fraud claims Caghan invented and prosecuted:

> [W]ith respect to the so-called "phony court orders," the Court finds these allegations to be completely unsupported and frivolous. The [consent order], signed by Plaintiffs, was a condition of the Forbearance Agreement. Plaintiffs signed the Consent Order in April of 2014, as was required by the Forbearance Agreement. Plaintiffs were represented by counsel at that time. It is, quite frankly, ridiculous for Plaintiffs to come back two and a half years later and allege that they were under the impression that the consent order which they had signed in connection with the Forbearance

Agreement was a "phony court order" that Defendants used to trick them into thinking a judge had ordered Plaintiffs to hand over the Hotel. This theory of liability on Plaintiffs['] behalf is a complete fabrication without a shred of evidence in support thereof.

The district court granted the bank's motion for sanctions, finding that the affidavits Caghan's clients filed resisting summary judgment "were made falsely and in bad faith." The court stated,

Plaintiffs and [their] counsel said what needed to be said in order to survive summary judgment without regard for whether there was a legitimate basis for these statements. Plaintiffs' assertions that [they] had **no** knowledge of the Scott County foreclosure action is directly contradicted by the many examples of not only communications sent by counsel for Defendants, but references to the foreclosure action in Plaintiffs' own documents and reports generated by Plaintiffs' expert witnesses. The clearest and most obvious smoking gun was Madhiwala's 2015 affidavit offered in support of his case against Defendants in Cook County, in which he specifically references the Scott County foreclosure case. When examining these blatant contradictions from an objective standpoint, the Court cannot help but conclude that Plaintiffs and [Caghan] violated Iowa Rules of Civil Procedure 1.981(7) and 1.413(1).

The district court believed the plaintiffs' arguments about the consent order left "the Court no choice but to conclude that the allegations concerning the Consent Order were fabricated in order to sustain the cause of action." Caghan's misconduct is reprehensible and led directly to the court's entry of judgment on its sanction award of $123,359 against Caghan and his clients who the court found "willingly made false representations at Caghan's urging."

We have a monetary measure for the harm Caghan's misconduct caused the opposing party: the $123,359 in attorney fees incurred defending the false claims in court actions in two states. The district court's sanction award in that amount remains unsatisfied, which leaves the victim uncompensated. And because Caghan's clients are jointly and

severally liable for the cost judgment, we also have client harm in that amount to consider in calibrating the disciplinary sanction. Yet the majority fails to discuss this victim harm or client harm in setting its six-month sanction.

The majority relies primarily on the six-month suspension imposed in *Iowa Supreme Court Attorney Disciplinary Board v. Barnhill*, 885 N.W.2d 408, 426 (Iowa 2016), which in turn found a "useful comparator" in the six-month suspension imposed in *Iowa Supreme Court Attorney Disciplinary Board v. McGinness*, 844 N.W.2d 456, 467 (Iowa 2014). McGinness lied about serving discovery responses and doubled down on his false story when challenged, resulting in needless court proceedings. *McGinness*, 844 N.W.2d at 466. McGinness had an unblemished disciplinary history and a strong record of community service, and we viewed his misconduct as "an extraordinary one-time occurrence that is out of character for him." *Id.* at 467. During the disciplinary proceedings, McGinness "largely [fell] on his sword" and "unequivocally concede[d] the record support[ed] the ethics violations." *Id.* at 464.

By contrast, Caghan, throughout these disciplinary proceedings, has continued to claim the fraud actions were justified. Caghan has a history of frivolous claims resulting in sanctions of $141,475 imposed by an Ohio court and $38,000 by an Illinois court.

We equated Barnhill's conduct to that of McGinness and warned that if the pattern of frivolous litigation "continues, the sanctions will escalate further . . . including possible revocation." *Barnhill*, 885 N.W.2d at 426. Caghan's pattern of false or frivolous claims in three states justifies escalating his sanction to at least one year. We noted Barnhill's volunteerism and pro bono work and her voluntary cessation of practice in mitigation. *Id.* at 425. No mitigating factors justify leniency for Caghan.

The majority also relies on *Iowa Supreme Court Attorney Disciplinary Board v. Sporer,* imposing a six-month suspension on a lawyer who gave false testimony litigating contempt proceedings over a disputed settlement. 897 N.W.2d 69, 90–91 (Iowa 2017). In imposing the six-month suspension, we concluded Sporer's conduct was most analogous to the conduct in *McGinness.* *Id.* We determined that the Board failed to establish that Sporer had engaged in conduct prejudicial to the administration of justice "because the Board has not shown that the hearings associated with the contempt matter would not have occurred but for the ethical violations or that they were materially delayed or extended by Sporer's unfounded testimony." *Id.* at 87. There is no such failure of proof here—Caghan's misconduct resulted in multiple court hearings and two lawsuits that never should have been filed and cost $123,359 to defend.

"We have said '[d]ishonesty, deceit, and misrepresentation by a lawyer are abhorrent concepts to the legal profession, and can give rise to the full spectrum of sanctions, including revocation.'" *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Beek,* 757 N.W.2d 639, 643 (Iowa 2008) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hall,* 728 N.W.2d 383, 387 (Iowa 2007)). "Because honesty is crucial to the judicial process and administration of justice, a misrepresentation by a lawyer 'generally results in a lengthy suspension of the license to practice law.'" *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ruth,* 656 N.W.2d 93, 100 (Iowa 2002) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hohenadel,* 643 N.W.2d 652, 656 (Iowa 2001)). We have previously stated,

> Fundamental honesty is the base line and mandatory requirement to serve in the legal profession. The whole structure of ethical standards is derived from the paramount need for lawyers to be trustworthy. The court system and the

public we serve are damaged when our officers play fast and loose with the truth.

*Hohenadel*, 643 N.W.2d at 656 (quoting *Comm. on Prof'l Ethics & Conduct v. Bauerle*, 460 N.W.2d 452, 453 (Iowa 1990)).

Our cases provide ample support for at least a one-year suspension for false court filings. *See, e.g.*, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barry*, 908 N.W.2d 217, 234–35 (Iowa 2018) (imposing one-year suspension on attorney who repeatedly lied about the status of a dissolution action he never filed and who falsified a dissolution decree and judge's signature); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kallsen*, 814 N.W.2d 233, 238–40 (Iowa 2012) (imposing one-year suspension on an attorney who notarized and filed a forged guilty plea agreement without informing his client beforehand); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cunningham*, 812 N.W.2d 541, 554 (Iowa 2012) (imposing eighteen-month suspension on attorney who knowingly violated a discovery order, neglected client matters, and made misrepresentations to clients and officers of the court); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rickabaugh*, 728 N.W.2d 375, 381–82 (Iowa 2007) (revoking an attorney's license for fabricating documents, forging signatures, making misrepresentations, neglecting cases, accepting fees prematurely, practicing while suspended, and for otherwise "demonstrat[ing] a blatant disregard for his duty as an attorney to be honest and truthful").

For these reasons, I am unable to join the majority's opinion.

Christensen and McDonald, JJ., join this concurrence in part and dissent in part.